ROBERT CHARLES JONES, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 12844

October 17, 1985                              707 P.2d 1128

*Jeffrey D. Sobel,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert J. Miller,* District Attorney, *James Tufteland,* Deputy, *Douglas McCarthy,* Deputy, and *Scott S. Mitchell,* Deputy, Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

A jury found Robert Jones guilty of first degree murder and sentenced him to death. Jones challenges both the conviction and the imposition of the death sentence in this appeal. For the reasons set forth below, we affirm the conviction but set aside the death sentence and remand for a new penalty hearing.

## THE FACTS

In the early morning hours of September 29, 1978 an argument erupted in the Chy Inn Bar between Jones and Rayfield Brown. Another bar patron, Bobby Lee Robinson, testified that he tried to put an end to the argument by buying everybody a drink. Jones picked up the bottle of vodka Robinson had purchased for him, drank the contents, and then handed the bottle to Robinson. Robinson put the bottle back on the bar counter and moved away to play some records. Approximately three minutes later Jones walked out of the bar, returned with a handgun, pointed it to Brown's head and fired the gun. Brown died shortly thereafter of the gunshot wound to the head.

Jones left the bar before police arrived. He returned to his uncle's house, where he resided, and told a cousin that he had shot a man at a bar. Jones attempted to flee to Massachusetts by bus but was arrested enroute in Vail, Colorado.

The degree of Jones' intoxication was disputed during the trial. Defense counsel argued that Jones could not be guilty of first degree murder because he was severely intoxicated at the time of the shooting. Jones' uncle testified that Jones was intoxicated at 12:30 a.m., several hours before the confrontation at the bar. Another defense witness testified that Jones was stumbling over shrubbery and appeared to be drunk at about 6:00 a.m., approximately one to two hours after the shooting. Eyewitnesses to the murder testified that Jones' gait and speech were normal, and that he did not appear drunk. The evidence also indicated that Jones managed to bury the gun and walk home via an inconspicuous route, indicating that Jones was capable of premeditating the murder.

After the jury found Jones guilty of first degree murder, the prosecutor presented evidence of Jones' previous convictions at the penalty hearing as aggravating circumstances warranting the imposition of the death penalty.

Jones offered evidence in mitigation from his mother and Clark County jail officials. Jones' mother testified that he had had trouble in school, was illiterate, had a low I.Q., and that he offered to donate his kidney when hers failed. According to jail personnel, Jones had been a model prisoner during his incarceration before trial. After a brief deliberation the jury sentenced Jones to death.

## THE GUILT PHASE

### The Cautionary Instruction

Jones first contends that the district court prejudicially erred in not giving a cautionary instruction that no inference could be

drawn from his failure to testify. State trial courts have a constitutional obligation to give a cautionary instruction, upon proper request, "to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." Carter v. Kentucky, 450 U.S. 288, 305 (1981). Jones did not request a cautionary instruction, nor did he request a related instruction authorized by NRS 175.181(1).

Jones argues that a *Carter* violation occurred at his trial despite his failure to request the cautionary instruction. He contends that he was prevented from requesting a cautionary instruction by NRS 175.181(1) which the trial judge read to him while advising him of his right not to testify. NRS 175.181(1) provides:

> No instruction shall be given relative to the failure of the person charged with the commission of crime or offense to testify, except, upon the request of the person so charged, the court shall instruct the jury that, in accordance with a right guaranteed by the constitution, no person can be compelled, in a criminal action, to be a witness against himself.

We have previously recognized the futility of *objecting* to an instruction whose validity has been consistently upheld. *See* St. Pierre v. State, 96 Nev. 887, 620 P.2d 1240 (1980). In *St. Pierre* we cited with approval federal authority which excused the failure to *request* jury instructions "which, at the time of . . . trial, would have been inconsistent with the law as it then existed." *See* United States v. Wanger, 426 F.2d 1360 (9th Cir. 1970); *St. Pierre,* 96 Nev. at 892. We therefore proceed to analyze this issue under *St. Pierre's* two prong analysis focusing on (1) whether Jones had good cause for failing to request the cautionary instruction and (2) whether Jones has suffered prejudice to his substantial rights.

Jones has demonstrated good cause for his failure to request the instruction. Until *Carter* compelled state courts to give a cautionary instruction, if requested, we consistently held that an instruction elaborating on the language of NRS 175.181 was properly rejected. *See* Theriault v. State, 92 Nev. 185, 547 P.2d 668 (1976); McNeeley v. State, 81 Nev. 663, 409 P.2d 135 (1965). Jones' failure to request the instruction was therefore "caused" by firmly established caselaw which suggested the futility of such a request. As we stated in *St. Pierre,* "[t]here is no requirement that a defendant or his trial counsel be clairvoyant." 96 Nev. at 892.

Although Jones had good cause for failing to request a *Carter* instruction, we conclude that the absence of the instruction has not prejudiced his substantial rights. A *Carter* error is evaluated

under the harmless error standard of Chapman v. California, 386 U.S. 18 (1967). *See* Franklin v. State, 98 Nev. 266, 270, 646 P.2d 543 (1982). In *Chapman* the High Court determined that a violation of a defendant's Fifth Amendment privilege would not mandate automatic reversal: "[T]here may be some constitutional errors which . . . are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." 386 U.S. at 22.

After reviewing the evidence of Jones' guilt under this standard, we conclude that any prejudice to Jones resulting from the failure to give the cautionary instruction was harmless beyond a reasonable doubt. Evidence of Jones' guilt is overwhelming. Several eyewitnesses identified Jones as the killer. His counsel admitted in closing argument that Jones was the man who killed Brown. The only real dispute centered on the degree of Jones' intoxication. The jury was adequately instructed on this issue, and there was substantial evidence to support a finding that Jones was capable of premeditation. Given the overwhelming evidence of Jones' guilt, we conclude that the absence of a *Carter* instruction did not have any measurable impact on the jury's deliberations.

*Prosecutorial Misconduct*

At the conclusion of the guilt phase of the trial the prosecutor, Bradley Richardson, pleaded with the jury to be fair to the victim in this case.[1] Defense counsel objected to the remark, and the trial judge ordered it stricken from the record. Respondent now concedes that the remark was improper. *See* Mears v. State, 83 Nev. 3, 422 P.2d 230 (1967) (prosecutor's emotional appeal to consider victim's family improper). Our task, therefore, is to determine whether the prosecutor's misconduct was prejudicial to Jones, denying him a fair trial. *See* Moser v. State, 91 Nev. 809, 814, 544 P.2d 424 (1975); Pacheco v. State, 82 Nev. 172, 179, 414 P.2d 100 (1966).

Prosecutorial misconduct can and will result in the reversal of convictions when it denies defendants their right to a fair trial. *See* McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984). In *McGuire* we reversed the convictions of two defendants because of the extreme and outrageous nature of the misconduct involved.

---

[1] Jones raises several other instances of prosecutorial misconduct in his brief. We reject those contentions as unmeritorious and not deserving of discussion here.

Because we conclude that the misconduct in this case was much less egregious than the misconduct in the *McGuire* cases, we affirm Jones' conviction. Richardson's appeal to the jury to be fair to the victim in this case was immediately objected to and ordered stricken from the record:

> When you took your oath, you were voirdired or questioned and asked whether you could be fair and impartial to both sides. And I recall you all qualifying with a yes, that you would be fair to both sides.
> That includes the State of Nevada.
> *That would also include the victim in this case; who, of course, is not*
> MR. AMUNDSON: Objection, Your Honor.
> THE COURT: The objection is sustained.
> Stricken.

(Emphasis added.) Given the overwhelming evidence of Jones' guilt we conclude that this comment was not prejudicial. Nothing in *McGuire* requires us to abandon the harmless error rule, and we decline to do so now. *Cf.* Moser v. State, 91 Nev. 809, 815, 544 P.2d 424 (1975) (GUNDERSON, C. J., concurring).

## THE PENALTY PHASE

### Evidence of Prior Convictions

Jones contends that the district court erred in admitting evidence concerning his three prior felony convictions. He argues that testimony from the victims of his three prior felonious assaults was unduly prejudicial in light of defense counsel's offer to stipulate to the convictions. We reject this contention.

It is well established in Nevada that evidence of prior convictions is admissible at penalty hearings when relevant and credible and not dubious or tenuous. *See* Biondi v. State, 101 Nev. 252, 699 P.2d 1062 (1985); Allen v. State, 99 Nev. 485, 488, 665 P.2d 238 (1983). *See also* NRS 175.552. Although details of prior crimes undoubtably have a greater impact on a jury than a bare record conviction, their admission may aid the trier in assessing the character of a defendant. A defendant's character and his record are "relevant factors to be considered by a jury in imposing a penalty for a capital crime. . . ." *Allen,* 99 Nev. at 488. *See also* Woodson v. North Carolina, 428 U.S. 280 (1976). We conclude that the testimony presented at trial detailing the facts of Jones' prior convictions was relevant to Jones' character and therefore properly admitted by the district court.[2]

---

[2]Furthermore, we note that detailed information regarding prior convictions may work to the benefit of a defendant as well as to his detriment. For

*Executive Clemency Instructions*

During the penalty phase of the trial, the trial court read to the jury the following instructions:

### Instruction 5

In such a case, the jury is instructed to consider the aggravating circumstances, if any, to determine whether the aggravating circumstances justify the imposition of a death penalty.

Otherwise, the punishment imposed shall be imprisonment in the State Prison for life with or without the possibility of parole.

You are instructed that the sentence of life imprisonment without the possibility of parole does not exclude executive clemency.

If the punishment is fixed at life imprisonment with the possibility of parole, eligibility for parole begins when a minimum of ten years has been served.

### Instruction 6

Executive clemency involves an act of pardon which is evidenced by an executive order signed by the Governor absolving a defendant from the guilt of his criminal act and completely exempting him from the pains and penalties imposed on him by law. Executive clemency also includes action by the State Board of Pardons in commuting or reducing a defendant's punishment of life without the possibility of parole to life with the possibility of parole, or action by the State Board of Pardons in shortening the time a defendant is eligible for parole.

Executive clemency cannot be granted in any case unless there is a majority vote for clemency by a Pardons Board consisting of the Governor, the Attorney General, and the five Justices of the Nevada Supreme Court.[3]

---

example, in this case, after the state introduced evidence of Jones' three prior convictions, one in Mississippi and the other two in Massachusetts, Jones' mother testified that the 1968 Mississippi conviction was the subject of a civil rights investigation. According to Mrs. Jones, her son was stopped by a group of white policemen as he crossed the Covington County line from Charles County. Covington County is a dry county; Jones apparently had gone to Charles County to visit a bar. The police forced Jones to drive his car to a nearby graveyard instead of taking him to jail. They then poured gasoline on the car while Jones was still inside and then ignited the gas, trapping Jones inside. Jones, fearful for his life and severely burned, forced his way out of the car, hit one of the officers and ran through the woods to his aunt's house. Jones was subsequently convicted for felonious assault of a police officer and sentenced to serve four years in the Mississippi State Penitentiary. This was the first time Jones was in "trouble" with the law.

[3]During the first oral argument in this case, we discovered that these

(Footnote added.)

This court, *sua sponte*,[4] raised the issue of whether an instruction concerning the possibility of executive clemency for a sentence of life imprisonment without possibility of parole constituted reversible error. We delayed our decision in this case and reordered argument pending the United States Supreme Court's decision in California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446 (1983).

Although appellant's participation in the drafting of the challenged instructions would ordinarily preclude appellate review, Kearney v. State, 97 Nev. 127, 625 P.2d 93 (1981); Bonacci v. State, 96 Nev. 894, 620 P.2d 1244 (1980); Van Valkenberg v. State, 95 Nev. 317, 594 P.2d 707 (1979); McCall v. State, 91 Nev. 556, 540 P.2d 95 (1975), we may hear issues not raised below in appropriate cases. *See, e.g.,* St. Pierre v. State, 96 Nev. 887, 620 P.2d 1240 (1980); Wilkins v. State, 96 Nev. 367, 609 P.2d 309 (1980); Hudson v. State, 92 Nev. 84, 545 P.2d 1163 (1976). In a capital case where the record is sufficiently developed to provide an adequate basis for review and to demonstrate that fundamental rights are implicated, it is appropriate to hear a constitutional question for the first time on appeal. *Cf.* Wilkins v. State, 96 Nev. 367, 609 P.2d 309 (1980) (second degree murder; record not developed).

*Ramos* was decided adversely to Jones' contention that Instructions 5 and 6 regarding the possibility of clemency and parole constituted reversible error. In Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985) we relied on *Ramos* in stating: "We hold that the instruction regarding the possibility of pardon or parole is relevant to the defendant's sentence." 101 Nev. at 55.

In his closing remarks, however, the prosecutor elaborated on the language of these instructions and misstated the law.[5] The prosecutor's comments misled the jury about the commutation powers of the pardons board:

> Look at Jury Instruction No. 6. Write this down, so you can remember it.
> You might want to look at it when you're deliberating.
> Even if a person is put into prison with Life Without the

---

instructions were the result of a compromise between counsel. This compromise yielded a unique set of instructions. Apparently, Jury Instructions 5 and 6 are the amalgamation of NRS 175.554 and 175.161(7).

[4]Pursuant to an order issued by this court, the parties submitted supplemental briefs addressing the impact of People v. Ramos, 639 P.2d 908 (1982), *rev'd,* California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446 (1983).

[5]We also note that Instruction 6 itself was inaccurate. It failed to correctly state that the governor has veto power over any majority vote for pardon.

Possibility of Parole, there is always the possibility of executive clemency, which means there is always the possibility the defendant can have his sentence commuted from Life Without the Possibility to Life With the Possibility of Parole.

And he can also then receive parole on this matter.

And that is why, if there's any possibility of this gentleman getting out and getting back into the society of decent, law-abiding, normal—normally reacting humans—there should be no possibility for this man to ever get out.

*And, since there is a possibility, with Life Without, the State urges the death penalty.*

(Emphasis added.)

Although the Federal Constitution does not require a jury to be informed that death sentences, as well as life sentences, may be commuted, *Ramos,* 463 U.S. at ......, 103 S.Ct. at 3458, the jury may not be misled into believing that commutation of a death sentence is impossible. In *Petrocelli,* 101 Nev. at 57, we reaffirmed our holdings in Summers v. State, 86 Nev. 210, 467 P.2d 98 (1970), Serrano v. State, 84 Nev. 676, 447 P.2d 497 (1968), and Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965), *cert. denied,* Bean v. Nevada, 384 U.S. 1012 (1966) regarding the following proposition: "An instruction that discusses parole in a murder case is proper *if the jury is not misled* and so long as it does not enlarge upon the matter of parole such as requirements for eligibility, how the scheme works, etc." *Summers,* 86 Nev. at 213 (emphasis added). Although the court in *Bean* did not find the prosecutor's comments prejudicial to the defendant, it recognized "that remarks about [clemency] may get out of hand and sometimes result in prejudice." 81 Nev. at 35. Here, the prosecutor essentially told the jury that, because the pardons board might commute a life sentence without the possibility of parole, they must impose the death penalty to ensure that Jones would not be released. We conclude that the jury was misled into thinking that death sentences may not be commuted. Our holding that the state may not misinform jurors about the possibility of clemency in death sentences does not run afoul of the decision in *Ramos.* *Ramos* merely held that the jury need not be informed about the possibility of pardon of death sentences; it did not sanction misleading the jury into believing that death sentences were unpardonable. *Ramos,* 463 U.S. at 1012, 103 S.Ct. at 3459. The Court specifically noted that the Federal Constitution does not prohibit "an instruction regarding the . . . power to commute a death sentence." *Id.* at 1012 n. 27, 103 S.Ct. at 3458 n. 27.

We are required to determine whether a death sentence has

been imposed under the influence of passion, prejudice or any arbitrary factor. NRS 177.055(2)(c). We conclude that the jury may well have imposed the death sentence in this case arbitrarily and under the influence of passion. *Cf.* Caldwell v. Mississippi, ...... U.S. ......, 105 S.Ct. 2633, 2647 (1985) (prosecutor's misleading statement regarding appellate review created unacceptable risk that death sentence imposed arbitrarily or capriciously) (O'Connor, J., concurring). The legislature reenacted Nevada's death penalty statute with modifications in 1977 after the United States Supreme Court upheld a capital sentencing scheme in Gregg v. Georgia, 428 U.S. 153 (1976). *See* NRS 200.030; 1977 Nev. Stats. ch. 430, § 82, at 865; ch. 585, § 1, at 1542. Our examination of all cases reported since 1977 reveals that the State of Nevada has not imposed a sentence of death in a first degree murder case similar to the one at hand, but reserves capital sentencing for cases which exhibit a high degree of premeditation coupled with aggravating circumstances such as brutality, torture or depravity. In contrast, Jones' victim died almost immediately from a single shot to the head. Jones did not enter the bar intending to kill Brown; only after becoming antagonized did Jones leave to obtain the murder weapon. Given the barroom-confrontation setting of this crime, it is possible that the jury's sentencing decision was influenced by improper factors. We conclude that the prosecutor's misstatement of the powers of the pardons board may have convinced the jury that the only way to keep Jones off the street was to kill him. If the jury did consider the possibility of pardon or commutation in its deliberations, it is possible that their mistaken belief that death sentences were unreviewable influenced their decision. We cannot say that the jury would have imposed the death sentence if the prosecutor had not implied that death sentences were not commutable. Therefore, we vacate the death sentence and remand for a penalty hearing before a newly empaneled jury. At the new penalty hearing the district court may instruct the jury on the possibility of executive clemency only as authorized by our decision in *Petrocelli.*

If the newly empaneled jury opts to impose another death sentence on Jones, we will review the sentence at that time for proportionality as required by NRS 177.055(2)(d).[6] We decline to do so now because we conclude that an objective, reasonable jury, supplied with accurate, not misleading, information, may

[6]NRS 177.055(2)(d) was recently amended to abolish the proportionality review requirement. 1985 Nev. Stats. ch. 527, § 1, at 1597-1598. This amendment is inapplicable in this case since Jones' crime was committed before the amendment took effect. *See* Wilson v. State, 101 Nev. 452, 705 P.2d 151 (1985).

well decide not to impose a death sentence under the facts presented here.

Jones' remaining assignments of error are held to be without merit. We affirm the judgment of conviction, vacate the death sentence and remand for a new penalty hearing.