RODNEY LYN EMIL, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 19431

December 28, 1989                                       784 P.2d 956

[Rehearing denied March 6, 1990]

*Schieck & Derke,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

On June 17, 1984, Charles Emil, appellant's stepfather, was shot and killed.

Appellant, ·Rodney Lyn Emil (Emil), was eventually arrested and charged with the murder of his stepfather. Following a trial,

the jury returned a verdict of guilty of murder in the first degree with use of a deadly weapon. After a June 8, 1988, penalty hearing, the jury determined that Emil should be sentenced to death. This appeal followed.

*Facts*

The facts adduced at trial presented a scenario that commenced on June 17, 1984, when Frederick Woodall, Alan Carmack and Emil met at Woodall's home for a barbecue. When Emil arrived, he explained that he needed to meet with his stepfather, Charles Emil. Shortly thereafter, Carmack, Emil and Woodall left in Carmack's pickup truck to go purchase barbecue supplies. At the grocery store, Emil told Woodall that he had to call his stepfather.

After purchasing the supplies, Carmack and Woodall entered the cab of Carmack's truck and Emil climbed into the truck's bed. The trio then drove to a desert area south of Tropicana Road on Rainbow Boulevard in Las Vegas. Carmack pulled his truck alongside a white pickup truck parked just off the road. Woodall testified that Emil immediately stood up in the back of Carmack's truck, pulled a revolver from a paper bag and fired four shots at the occupant of the white truck. The victim moved toward the passenger door and slumped down onto the floor. One of the shots shattered the passenger window.

Woodall testified that when he realized what had happened he and Carmack left the scene as Emil jumped from Carmack's truck and proceeded to chase them in the victim's truck. Woodall stated that Emil forced Carmack off the road at gunpoint and then told Woodall and Carmack that their families would be harmed if they ever told anyone about the shooting. Emil then entered Carmack's truck and the three men drove away, leaving the victim's truck behind.

Officer Dennis Cobb of the Las Vegas Metropolitan Police Department was the first police officer to arrive at the crime scene. Cobb observed a white male lying on the floorboard of the white truck. The passenger window was broken but no glass fragments were found outside of the vehicle. The registered owner of the vehicle was Charles Emil.

The body in the vehicle was later identified as Charles Emil. An autopsy revealed that the victim had been shot four times. Death was the result of a bullet that passed through the victim's neck, cutting his carotid artery, causing massive hemorrhaging.

A little over a year after Charles Emil was killed, Woodall, who had been incarcerated for a probation violation, told police officers that he had information regarding the June 17, 1984,

Rainbow Boulevard shooting. Woodall testified that he waited a year because he feared for the safety of his girlfriend and their son. When he finally reported the details of the shooting, he also directed a Las Vegas Metropolitan Police Department detective, Michael Geary, to the crime scene where Geary discovered broken automotive glass fragments. Woodall also told police that approximately two weeks before the victim was killed, Emil told Woodall that $10,000 could be made if his stepfather was killed.

Martin Koba, who knew Emil, testified that in May or June, 1986, he came upon a group of three or four people, including Emil, and although he was three or four feet away from them, he was able to overhear the conversation and specifically heard a voice that sounded like Emil's saying something to the effect that "my mother hired my buddy and me to kill my stepfather." He then heard the same person refer to the purpose for the killing in terms of a possible recovery of insurance policy proceeds.

### Guilt Phase

Emil contends that it was reversible error to admit the testimony of Martin Koba without proper foundation during the guilt phase of the trial. He challenges the conversation as analogous to a telephone conversation which is admissible only if the identity of the caller is satisfactorily established by circumstantial or other competent evidence. Longley, 86 Nev. 599, 472 P.2d 350 (1970); King v. State, 80 Nev. 269, 392 P.2d 310 (1964).

Koba knew Emil. Koba testified that in May or June of 1986, he was about four feet away from a group that included Emil, and that he overheard an incriminating statement from a speaker who sounded like Emil.[1]

---

[1]Specifically, the following exchange took place at trial

Q  Did you hear the defendant say something about his stepfather?
A  At the time I overheard this conversation, I was not visible—I was not in on part of the conversation, nor was I visibly in sight of the participants. I heard a voice that sounded like Rodney, relating a murder.
Q  You say that you weren't actually participating in the conversation per se?
A  I was about four feet away.
Q  What did you hear?
  MR. SCHIECK: Your Honor, I'm going to object at this time. This witness indicated he is unable to identify the speaker. All he can say is it sounded like a particular person. I don't believe he's competent to give testimony as to what he overheard.
  MR. HARMON: Your Honor, he said that the voice sounded like

Emil argues that because Koba did not positively identify his voice, proper foundation was not established and that it was error not to exclude Koba's testimony.

This contention lacks merit. NRS 52.065 provides that "[a] voice, whether heard first hand or through mechanical or electronic transmission or recording, is sufficiently identified by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

Additionally, federal courts interpreting Federal Rules of Evidence 901(a) and 901(b)(5),[2] a rule almost identical to NRS 52.065, have interpreted it according to its plain meaning. *See, e.g.,* United States v. Alvarez, 860 F.2d 801, 809 (7th Cir. 1988) (where government witnesses had considerable opportunity to become familiar with the voices of appellants, attacks on the accuracy of voice identification goes to the weight of the evidence); United States v. Cerone, 830 F.2d 938, 949 (8th Cir. 1987) ("Any person may identify a speaker's voice if he has heard the voice at any time.").

Our reading of NRS 52.065, buttressed by federal decisions concerning the similar federal rule of evidence, compels us to conclude that the State laid the proper foundation under NRS 52.065 to admit Mr. Koba's testimony.

Although Koba's credibility was subject to challenge, questions concerning Koba's credibility simply went to the weight to be accorded his testimony and not to its admissibility. *See* Azbill v. State, 88 Nev. 240, 352 P.2d 1064 (1972).

---

Rodney Emil. Having laid that foundation, I think it goes to weight, not admissibility.

THE COURT: I do too. The objection is overruled. You may answer the question.

MR. HARMON: Thank you.

BY MR. HARMON:

Q   What did you hear the person say, whose voice sounded like that of Rodney Emil?

A   This is not an exact quote, but to the effect, "My mother hired me and my buddy to bump off my stepfather." Again, it's been two years. I can't give you a verbatim quote on it. That's the gist of it.

Q   Did you hear the voice which sounded like that of the defendant say why his mother had done this?

A   Yes. For the insurance money.

[2]Federal Rule of Evidence 901(a) provides:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Federal Rule of Evidence 901(b)(5) provides:

Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

Emil next argues that the evidence adduced at trial was insufficient as a matter of law to establish his guilt beyond a reasonable doubt. In reviewing trial evidence, the question is not whether this court is convinced of a defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could have been convinced to that certitude by the evidence it had a right to consider. Wilkins v. State, 96 Nev. 367, 609 P.2d 309 (1980).

Based on the foregoing standard and the evidence in this case, the jury reasonably could have found Emil guilty of first degree murder with use of a deadly weapon. First, Frederick Woodall testified that on June 17, 1984, he saw Emil fire at the victim three or four times with a revolver. Woodall further stated that the passenger window of the truck occupied by the victim was shattered by the gunshots and that the victim fell onto the floorboard. Woodall's observations were consistent with the police and autopsy reports.

Second, Detective Geary of the Las Vegas Metropolitan Police Department testified that Woodall directed him to the murder site which was due south of the place where Charles Emil's truck and dead body were discovered. At the murder site identified by Woodall, Detective Geary discovered fragments of broken automotive glass which corroborated the testimony explaining why no glass fragments were found next to the vehicle where it was first discovered by the police.

Third, Woodall stated that on the day of the murder, Emil told him that he needed to call his stepfather and that he later observed Emil making a call from a public telephone shortly before he, Carmack and Emil met the victim's vehicle.

Fourth, Woodall testified that two or three weeks before the shooting Emil told him that it would be financially beneficial for Emil to kill his stepfather. Woodall also stated that on the day the victim was buried, Emil boasted that he was a good shot, having hit his stepfather three times in the heart and once in the brain.

Fifth, as previously noted, Martin Koba, one of Emil's associates, testified to overhearing someone whose voice sounded like Emil's state that he had been hired to kill his stepfather.

The foregoing notwithstanding, Emil correctly points out that there are time discrepancies in Woodall's testimony relating to the day of the murder. Hence, Emil argues that his conviction should be overturned for want of sufficient evidence. Woodall explained, however, that he was not wearing a watch on the day of the murder and had no reason to pay particular attention to the time. Furthermore, discrepancies in testimony are relevant to the witness' credibility, a matter left to the jury. Ward v. State, 95 Nev. 431, 596 P.2d 219 (1979). On appeal, this court will not

overturn a verdict because of inconsistencies already resolved by the jury as the trier of fact. *Id.*, 596 P.2d at 221.

## Penalty Phase

Emil contends that a polygraph exam taken by Woodall and ruled by the trial judge to be incompetent and inadmissible, should have been admitted during the penalty phase of his trial. Emil argues that this evidence would have gone to mitigation because Woodall allegedly failed the polygraph exam.

According to statute, questions concerning the admissibility of evidence during the penalty phase of a capital murder trial are generally left to the trial judge's discretion. NRS 175.522. *See* Milligan v. State, 101 Nev. 627, 708 P.2d 289 (1985). Although this court has never ruled on the admissibility of polygraph test results at a penalty hearing, such results are admissible at the guilt phase of trial only if both parties have signed a written stipulation to that effect. Santillanes v. State, 102 Nev. 48, 714 P.2d 184 (1986).

In the instant case, Woodall's polygraph examination results were not admissible at the guilt phase of trial because the parties did not stipulate to their admission. The test results did not come in at Emil's penalty hearing for the same reason. This was a correct ruling by the trial judge. If polygraph results were available to defendants when deemed to be favorable to their cause, an equal entitlement should be accorded the prosecutor when favorable to the State's case. We are not persuaded that the degree of reliability of such examinations warrants a unilateral right of admissibility in the penalty phase of a capital case. Therefore, Woodall's polygraph examination results were properly excluded.

Next, Emil insists that the lower court erred in denying his motion to strike and in admitting evidence of a prior conviction at his penalty hearing. Emil argues that at the time of his stepfather's murder he had not been convicted, charged or even arrested for a March, 1983 murder. Emil contends, therefore, that under NRS 200.033(2),[3] the 1983 murder should not qualify as an aggravating circumstance.

---

[3]NRS 200.033(2) provides:

Circumstances aggravating first degree murder. The only circumstances by which murder of the first degree may be aggravated are:

. . . .

2. The murder was committed by a person who was previously

In Gallego v. State, 101 Nev. 782, 711 P.2d 856 (1985), the defendant made a similar argument. However, this court stated in response:

> Aggravating circumstances, as defined by the statute, provide direction to the sentencing authority as it considers an appropriate punishment for the defendant. The statute was never intended to operate on the vagaries of conviction sequences. Instead, the focal point is the time of sentencing. The sentencing panel is entitled to consider all relevant aspects of the defendant's criminal background prior to rendering sentence.

*Id.* at 792, 711 P.2d at 863-864.

Emil urges this court to overrule *Gallego* and reinterpret NRS 200.033(2). He argues that the proper interpretation of the statute is that only prior felony convictions existing at the time of the murder under consideration can be used as an aggravating circumstance. We disagree. It would be both absurd and counterproductive for this court to construe the plain language of the statute so as to exclude murders occurring before the primary offense and for which convictions are obtained prior to the penalty phase of a defendant's trial. *Cf. Gallego,* 101 Nev. at 793, 711 P.2d at 864.

Emil further contends that it was error for the trial court not to limit the evidence of his prior murder conviction to entry of a certified copy of the conviction. Twenty-nine days prior to Emil's penalty hearing, he was provided with notice from the State that evidence would be presented surrounding the prior murder consisting of both testimony and the certified record of conviction.

Under NRS 200.033(2), prior murder convictions constitute aggravating circumstances. In Milligan v. State, 101 Nev. 627, 708 P.2d 289 (1985), this court held that questions concerning the admissibility of evidence during the penalty phase are largely left to the trial judge's discretion. In Jones v. State, 101 Nev. 573, 707 P.2d 1128 (1985), a first degree murder and death penalty case, we determined that the penalty phase testimony of the victims of three prior felonious assaults was proper even though defense counsel offered to stipulate to the convictions. Specifically, we stated:

> It is well established in Nevada that evidence of prior convictions is admissible at penalty hearings when relevant

---

convicted of another murder or of a felony involving the use or threat of violence to the person of another.

> and credible and not dubious or tenuous. *See* Biondi v. State, 101 Nev. 252, 699 P.2d 1062 (1985); Allen v. State, 99 Nev. 485, 488, 665 P.2d 238 (1983). *See also* NRS 175.552. Although details of prior crimes undoubtably have a greater impact on a jury than a bare record conviction, their admission may aid the trier in assessing the character of a defendant. A defendant's character and his record are "relevant factors to be considered by a jury in imposing a penalty for a capital crime. . . ." *Allen,* 99 Nev. at 488. *See also* Woodson v. North Carolina, 428 U.S. 280 (1976).

*Id.* at 578, 707 P.2d at 1132.

Under *Jones,* it cannot be said that the admission of testimony concerning the prior murder conviction was an abuse of discretion. Specifically, it is reasonable to assume, as the State asserts, that the testimony was helpful in assessing Emil's character and in affixing the proper punishment. *See also* Woodson v. North Carolina, 428 U.S. 280 (1976) (relevant factors to be considered by jury in imposing a penalty for a capital crime include the character and record of the individual offender). Therefore, we hold that it was proper to allow testimony relating to Emil's prior murder conviction.

We note, however, that the lower court erred in admitting three particular items of evidence, over Emil's objection, concerning the prior murder conviction. First, admission of the autopsy photographs taken of the victim's body after it had been bludgeoned about the head, shot, partially burned and left in the trunk of a car for several days; second, evidence of the discernible odor coming from the car where the body was found; and finally, the testimony of the victim's former roommate that the victim was a "nice guy." Although a trial court may admit evidence or testimony of the facts and circumstances concerning a prior murder conviction, such evidence or testimony must be helpful in assessing the defendant's character and determining the proper punishment. It may not be admitted to essentially and primarily inflame and agitate the jury. The aforementioned evidence was of that basic nature and purpose. However, we have determined that the error in admitting the referenced evidence was harmless beyond a reasonable doubt. The evidence of aggravation so clearly outweighed that of mitigation that the error did not impair the jury's function in determining Emil's punishment.

Emil knew for over twenty-nine days that the State planned to offer evidence of his prior murder conviction as an aggravating

circumstance. His claim that the notice he received was inadequate is therefore without merit. *See* Rogers v. State, 101 Nev. 457, 705 P.2d 664 (1985) (two and one-half weeks was adequate time to develop mitigating circumstances in response to anticipated aggravating circumstances).

■■■■

Finally, Emil contends that prosecutorial misconduct during final argument of the penalty hearing deprived him of a fair hearing because the prosecutor argued the circumstances of Emil's prior murder conviction to inflame the passion of the jury.[4] Moreover, Emil claims that he was prejudiced by the prosecutor impermissibly misleading the jury on the question of youth as a mitigating factor.[5]

---

[4]Emil did not object to the alleged misconduct below. However, under Flanagan v. State, 104 Nev. 105, 754 P.2d 836 (1988), it is not clear that compliance with the contemporaneous objection rule is invariably required in a death case.

In any event, Emil specifically objects to the following references to the prior murder and suggests that they were made solely to inflame the jury:

> Ross Tolley, who was in his early 20's, who had lived for a short time in this community, and who obviously had shortcomings like we all do, but was entitled to live out his life.
>
> . . . .
>
> And you can look, as you have already done, at the one photograph, after the hair was shaved back which shows the head, and you can see the ferocity of those blows which undoubtedly disarmed Ross Tolley.
>
> . . .
>
> . . . .
>
> You can see evidence of the vehicle, evidence on the body of what occurred. The murder of Ross Tolley was suspicious. It was brutal, [sic] There can be no justification for the murder of a 21 or 22 year old man. Now, the State of Nevada draws a line; the line has been drawn, sir, Rodney Emil.
>
> . . . .
>
> This man, who claims he had an alibi in connection with the Tolley killing, who claims he was in Idaho picking up a load of hay, could have told the police that, could have testified to the other jury.

[5]Specifically, Emil identifies the following remarks as objectionable:

> Number Six, the youth of the Defendant at the time of the crime. Well, when you are my age, 23 is young. However, I wonder if the legislature contemplated 23 years of age, a person who had been on his own since he was 14 or 15, as being youthful. Mr. Schieck says he was a young 23. On the contrary, when we hear what happened to Mr. Emil, I argue he was an old 23, and if we're talking about a 14 or 15 year old boy, if we were talking about Mr. Emil committing this crime shortly after his stepfather disowned him and forced him to leave the family home, then I could appreciate it that the conduct may have been a reaction to what occurred by an immature, youthful mind. We wouldn't justify it—
>
> MR. POTTER: Your Honor, I'm going to object at this point, and I'd

In Flanagan v. State, 104 Nev. 105, 754 P.2d 836 (1988), a death penalty case involving prosecutorial misconduct, this court stated that "[a]t the sentencing phase, it is most important that the jury not be influenced by passion, prejudice, or any other arbitrary factor." Nonetheless, this court has also stated that details of prior crimes may assist the jury in evaluating the character of the defendant. *Jones,* 101 Nev. at 578, 707 P.2d at 1132. And, a defendant's character is a relevant factor to be considered in imposing a penalty for a capital crime. *Allen,* 99 Nev. at 488, 665 P.2d at 240.

We hold that the prosecutor was not impermissibly attempting to inflame the jury with passion or prejudice in the penalty hearing. Rather, the prosecutor was simply drawing inferences concerning Emil's character based upon the record evidence. Details of prior crimes and a defendant's character are relevant factors to be considered by a jury in imposing a penalty in a capital case.

The comments regarding Emil's youth likewise do not rise to the level of prosecutorial misconduct. Clearly, the youth of the defendant at the time of the commission of a crime is a mitigating circumstance in a capital murder case. *See* NRS 200.035(b). The challenged exchange suggests that the defense was hoping to establish youth as a mitigating factor by characterizing Emil as a "young" twenty-three-year old. The State merely countered defense counsel's portrayal by suggesting that Emil was in fact "old" for his age, and by pointing out that the mitigating circumstance contemplated by NRS 200.035(b) is an age younger than twenty-three. In short, defense counsel invited the State's remarks concerning Emil's age and it was not error to permit the prosecutor to so respond.

---

like to make a record on this. You cannot seek the death penalty on a 14 or 15 year old child in this state.

MR. HARMON: I wasn't arguing we were going to impose the death penalty—excuse me, your Honor, I'm saying 14 or 15—

THE COURT: Do you want to have a session outside the presence of the jury, is that what you're saying?

MR. POTTER: No. I'm making that for the record, Your Honor. You cannot seek the death penalty on an individual unless they are over the age of 16.

MR. HARMON: Well, it's true you have to be 16 or older, that wasn't the point at all. I'm saying 14 or 15 is young. 14 or 15 is a situation where we would way, [sic] Yes, you mitigate, perhaps you're lenient, perhaps you give him life with parole'. [sic] We're talking about a 23 year old man, a 23 year old man who had the maturity to procure a firearm, who obviously reloaded the firearm, who then orchestrated a situation where he was taken to a scene, knowing his stepfather would be there, who had a partner pull up to where he would be even with the cab, and began to fire.

In conclusion, we hold that Emil's sentence of death was not the result of passion, prejudice or any arbitrary factor and that it was not excessive, considering both the crime and the defendant. Having concluded that Emil was fairly tried, convicted and sentenced, we affirm in all respects the judgment of conviction and sentence imposed thereon.