STEVEN ALTONIO PARKER AKA STEVE ALTONIO PARKER, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 22378

April 2, 1993                                        849 P.2d 1062

[Rehearing denied July 7, 1993]

*Nathaniel J. Reed,* and *Norman J. Reed,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex A. Bell,* District Attorney, and *James Tufteland,* Deputy District Attorney, and *Gary Guymon,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, SHEARING, J.:

Appellant Steven Altonio Parker was convicted by a jury of first degree murder and sentenced to death. Parker raises six issues on appeal: (1) whether the district court erred in denying his motion for a mistrial after a witness stated that Parker had a "fatal attraction" for the victim; (2) whether the district court's reasonable doubt instruction was unconstitutional; (3) whether the district court erred in refusing his proffered instruction on reasonable doubt; (4) whether the district court erred in disallowing a police memorandum and report into evidence during the penalty phase; (5) whether the prosecutor engaged in misconduct during closing arguments at the guilt phase; and (6) whether the sentence of death is excessive in this case. We have concluded that Parker's contentions are without merit and that he was fairly tried, convicted, and sentenced to death. We therefore affirm.

### FACTS

Joanne Oscars discovered the body of her daughter, Debra Oscars (Oscars), in the kitchen of Oscars' apartment. Subsequently, several officers from the Las Vegas Metropolitan Police Department (LVMPD) arrived at the scene. Upon entering the apartment, a LVMPD officer noticed evidence of a struggle in the

living room area, and found Oscars' partially nude body on the kitchen floor. Her legs were separated, a quilt had been placed under her buttocks, and her T-shirt (the only article of clothing on her body) was pulled up around her neck. The LVMPD officer noticed smeared and pooling blood on the floor around Oscars' body, found identifiable bloody palm prints, and observed that a knife was imbedded to the hilt in Oscars' chest.[1] A three-by-five inch jagged-edged rock was found on the stove. This rock was covered with blood and had a clump of hair attached to it.

The police discovered additional finger and palm prints,[2] most of which matched Parker's. The police subsequently arrested Parker for Oscars' murder.

A medical examiner's autopsy investigation revealed twenty-five irregular blunt lacerations on Oscars' skull, a stab wound in the chest (which had been inflicted post mortem), and several defensive wounds, including bruises on Oscars' hands and a fractured finger. The medical examiner concluded that Oscars' death resulted from multiple blunt trauma to the head and that the instrument *could* have been a rock. In addition, a leather strap and a piece of electrical cord were wrapped around Oscars' neck, but no ligature markings or other evidence of strangulation were found.

The medical examiner found no evidence of sexual injury, but semen was discovered in both the vagina and rectum. Because the semen came from a nonsecretor (a person who does not secrete his blood group substance in his body fluids), the police could not positively identify or eliminate Parker as the source of the semen found in Oscars' body.

At trial, Oscars' brother testified that Parker loved his sister and was "infatuated" with her but that his sister did not feel the same way about Parker. He also stated that Parker's love of his sister was a "fatal attraction." After Oscars' brother made this statement, the judge admonished the jury to disregard it, and defense counsel moved for a mistrial. In a subsequent discussion outside of the jury's presence, the judge denied the motion but warned the prosecutor not to use the words "fatal attraction" during closing argument.

---

[1] The officer testified that the knife appeared to be from a set in Oscars' kitchen.

[2] Two bloody prints lifted from the kitchen floor (on the right side of the victim) matched Parker's left palm. Another bloody print found on the kitchen floor (on the left side of the victim) matched Parker's right palm. The police recovered two other bloody prints, which matched Parker's palm prints, one from the stair bannister, and one from the kitchen counter. A print on the cold water faucet and the kitchen sink also matched Parker's prints. Other bloody prints were found, but were smudged and unidentifiable.

The jury found Parker guilty of first degree murder with the use of a deadly weapon. After the penalty hearing, the jury sentenced Parker to death. The jury found four aggravating circumstances: (1) the murder was committed by someone under a sentence of imprisonment; (2) the murder was committed by someone previously convicted of a felony involving the use or threat of violence; (3) the murder was committed during the commission of or attempted commission of sexual assault; and (4) the murder involved torture, depravity of mind, or mutilation of the victim.

## DISCUSSION

### 1. Parker's Motion for a Mistrial

At trial, Oscars' brother testified that Parker was obsessed and had a "fatal attraction" to his sister. Parker contends that this testimony was so prejudicial that the court should have granted a mistrial.

In Allen v. State, 99 Nev. 485, 490, 665 P.2d 238, 241 (1983), this court stated that when a motion for a mistrial has been denied, the appellant must "prove that the inadvertent statement was so prejudicial as to be unsusceptible to neutralizing by an admonition to the jury." Parker contends that the "fatal attraction" remark was so highly prejudicial that it may have predisposed the jury to convict him.

Although the term "fatal attraction" may have improperly summoned into the minds of the jurors images from the movie of the same title, Parker suffered little undue prejudice from it. The testimony effectively communicated Oscars' brother's belief that Parker had an obsessive attraction to Oscars. This evidence was highly relevant, and was supported by the testimony of three other witnesses. Also, the evidence presented during this eight-day trial was far more graphic and harmful to Parker than any one-time "fatal attraction" statement could have been.

Although this "fatal attraction" statement aptly described Parker's obsessive infatuation with Oscars, the trial judge ordered the statement stricken and admonished the jury to disregard it. From the judge's admonition, the jury must have understood that it should not consider any peripheral connotations of the term "fatal attraction." Furthermore, the prosecution did not use the "fatal attraction" statement again.

In Owens v. State, 96 Nev. 880, 883, 620 P.2d 1236, 1238 (1980), this court held:

> Denial of a motion for a mistrial is within the trial court's sound discretion. The court's determination will not be

disturbed on appeal in the absence of a clear showing of abuse.

The district court acted within its sound discretion in denying Parker's motion for a mistrial.

Parker also contends that the prosecution introduced the "fatal attraction" statement deliberately to inflame the jury. This court has held that where a prosecutor solicits the prejudicial testimony, denial of defendant's motion for a mistrial will be deemed harmless error where the prejudicial effect of the statement is not strong and where there is otherwise strong evidence of defendant's guilt. Emmons v. State, 107 Nev. 53, 60, 807 P.2d 718, 722-23 (1991). Therefore, even if the district court erred in denying Parker's motion for mistrial, we conclude that the error was harmless because the evidence that supports Parker's guilt is overwhelming.[3]

## 2. The Reasonable Doubt Instruction

Parker asserts that the district court's reasonable doubt instruction was unconstitutional under Cage v. Louisiana, 498 U.S. 39 (1990). This argument lacks mérit. In Lord v. State, 107 Nev. 28, 38-40, 806 P.2d 548, 554-56 (1991), this court held that NRS 175.211, the Nevada statutory reasonable doubt instruction, does not violate due process and that its language is distinguishable from the unconstitutional language in *Cage*.

## 3. Parker's Proffered Instruction

Parker argues that the district court erred in refusing to use his proffered instruction on reasonable doubt. In making this assertion, Parker relies on his previous contention that the instruction which the district court actually used is unconstitutional. Because, as discussed above, the reasonable doubt instruction used by the court is not unconstitutional, we find that this assertion also lacks merit.

In addition, the district court is not permitted to "define the concept of reasonable doubt in any manner other than that set by the legislature in NRS 175.211." Milligan v. State, 101 Nev. 627, 631, 708 P.2d 289, 292 (1985), *cert. denied,* 479 U.S. 870 (1986). Because the district court used the reasonable doubt

---

[3]It is also noteworthy that it was actually defense counsel who first used the phrase "fatal attraction" in his opening statement to the jury.

instruction set forth in NRS 175.211, it did not err when it refused Parker's proffered instruction.

#### 4. The Police Report and Memorandum

Parker argues that during the penalty phase the district court erred in refusing to admit a police inter-office memorandum and a police report into evidence. The memorandum and report refer to an informant, known as "William," "Billy," or "Willie," who contacted Oscars' mother on several occasions with information about Oscars' murder. The police tried to establish contact with this person, but were unable to meet with him, or even confirm his name or identity.

Parker asserts that the police memorandum and report were relevant to sentencing because they suggested that Parker was merely an accomplice and that his participation in the murder was relatively minor. Under NRS 200.039, evidence that a defendant was an accomplice or a minor participant in the crime may constitute a mitigating circumstance.

Evidence not ordinarily admissible during the guilt phase may be presented at the penalty phase if it is relevant to sentencing. NRS 175.522; Pellegrini v. State, 104 Nev. 625, 630, 764 P.2d 484, 489 (1988). Additionally, the jury cannot be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record or any circumstance of the case. Franklin v. Lynaugh, 487 U.S. 164, 171 (1988). However, in *Franklin*, the United States Supreme Court made it clear that the jury need not revisit the issue of a defendant's guilt or innocence. *Id.* at 173.

Parker's efforts to introduce the police memorandum and report basically constitute an attempt to make the jury reconsider Parker's guilt or innocence. During the guilt phase, Parker extensively questioned at least seven witnesses with respect to the identity of the informant, including the investigating police officers. The jury heard extensive evidence regarding the identity of the informant during the guilt phase. Furthermore, the trial court should not admit evidence which is "impalpable" or "highly suspect" in the penalty phase. Young v. State, 103 Nev. 233, 237, 737 P.2d 512, 515 (1987). Also, the trial judge may not admit evidence that is "dubious" or "tenuous." Allen v. State, 99 Nev. 485, 488, 665 P.2d 238, 240 (1983). The police were never able to identify this informant. Therefore, there was no evidence at trial regarding the informant's identity or purpose or

motive in providing this information. Consequently, this evidence was highly suspect. Even though evidence not ordinarily admissible during the guilt phase of trial may be presented during the penalty phase, it must have some reliability.

This court has held that "[t]he decision to admit particular evidence during the penalty phase is within the sound discretion of the trial court, and will not be overturned absent an abuse of that discretion." *Pellegrini,* 104 Nev. at 631, 764 P.2d at 488. We conclude that the police memorandum and report are dubious and tenuous evidence, and furthermore, that the substance of the report had already been introduced by Parker in the guilt phase of the trial. Thus, we hold that the trial court did not abuse its discretion by refusing to admit the police memorandum and report during the penalty phase.

### 5. Prosecutorial Misconduct

Parker argues that the prosecutor engaged in misconduct by stating facts not in evidence and also by expressing a personal opinion. In order to preserve the issue of prosecutorial misconduct for appeal, the defendant must raise timely objections and seek corrective instructions. Williams v. State, 103 Nev. 106, 734 P.2d 700 (1987); Moser v. State, 91 Nev. 809, 544 P.2d 424 (1976); Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965); Dotson v. State, 80 Nev. 42, 389 P.2d 77 (1964). In the instant case, Parker failed to object to the prosecutor's allegedly improper statements during the closing arguments. Therefore, this issue is precluded from review.

Even if Parker had preserved the issue of prosecutorial misconduct for review, his arguments are without merit. First, Parker contends that the prosecutor assumed facts not in evidence when he stated that "[t]here was a week when a fearful daughter stayed with her parents" and described a poignant moment when she lifted a hammer and said "See, Mom, I'll be all right." The testimony of Oscars' mother supports the prosecutor's statements. At trial, Oscars' mother stated that Oscars had stayed with her the week before the murder occurred. She stated that on the day Oscars returned to her apartment, Oscars grabbed a hammer out of her father's car and said, "Look Mom, I'm okay now. I've got something to protect me."

Parker also contends that the record did not support the prosecutor's statement: "On a number of occasions he [Parker] said he

loved her so much that he would kill someone over her." The record does, however, support this statement. Specifically, Oscars' brother testified at trial that Parker had told him many times that he would "beat somebody up" or "even kill somebody if they messed with her."

Parker further contends that the prosecutor wrongfully interjected his personal beliefs into evidence when he stated that "I suppose just to punctuate his acts, to dispel any idea that this was something other than murder of the first degree, assailant plunged a kitchen knife to the hilt." In Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985), this court held that it is prosecutorial misconduct for the prosecutor to interject his or her beliefs into an argument. However, this court noted that "'[s]tatements by the prosecutor, in argument, indicative of his [or her] opinion, belief, or knowledge as to the guilt of the accused, when made as a deduction or a conclusion from the evidence introduced in the trial, are permissible and unobjectionable.' The record in this case substantiates the conclusions of the prosecutor." Collins v. State, 87 Nev. 436, 439, 488 P.2d 544, 545 (1971).

In the instant case, the prosecutor began his closing statement with "I suppose just to punctuate his acts." He then reiterated that the murderer had "plunged a kitchen knife to the hilt." The prosecutor, relying on facts in evidence, was merely making a deduction or conclusion. We thus conclude that even if Parker had preserved this issue for review, the prosecutor did not engage in misconduct during closing arguments.

### 6. Review of Death Sentence

Finally, Parker contends that the sentence of death is excessive in his case. In reviewing death sentences, in addition to the alleged errors previously discussed, this court must consider: (1) whether the evidence supports the findings of aggravating circumstances; (2) whether the death sentence was imposed under the influence of passion, prejudice or any arbitrary factor; and (3) whether the sentence of death is excessive considering both the crime and the defendant. NRS 177.055(2).

NRS 177.055(2)(b) requires that this court review the evidence to assure that it supports the finding of each aggravating circumstance. The jury found the following four aggravating circumstances: (1) the murder was committed by someone under a sentence of imprisonment; (2) the murder was committed by someone previously convicted of a felony involving the use or threat of violence; (3) the murder was committed during the commission of or attempted commission of sexual assault; and

(4) the murder involved torture, depravity of mind, or mutilation of the victim.

After reviewing the evidence, we conclude that it clearly supports the findings of each of these aggravating factors.

With respect to the first aggravating factor found by the jury, there was evidence that Parker committed the murder while he was under a sentence of imprisonment. Parker's probation officer testified that Parker pled guilty to attempted accessory to robbery and was placed on probation for one year. The probation officer further testified that Parker was still on probation when he committed the murder. A person who is on probation for a felony offense at the time of the murder is deemed to be under a sentence of imprisonment. Grant v. State, 99 Nev. 149, 150, 659 P.2d 878, 879 (1983); Adams v. Warden, 97 Nev. 171, 172, 626 P.2d 259, 260 (1981).

We conclude that the second aggravating factor found by the jury, that the murder was committed by someone previously convicted of a felony involving the use or threat of violence, is also supported by the evidence. Certified copies of Parker's judgment of conviction were admitted into evidence which showed that Parker was convicted of attempted accessory to robbery. Also, the two victims of the attempted robbery testified during the penalty phase that Parker was one of the participants who tried to rob them. The probation officer testified that Parker pled guilty to, and was on probation for attempted accessory to robbery.

The third aggravating factor found by the jury, that the murder was committed during the commission of or attempted commission of sexual assault, is also supported by the evidence. There was extensive testimony that Parker was obsessively infatuated with Oscars. The condition of the apartment indicated that a struggle had occurred. The semen found in Oscars' vagina and rectum clearly shows that sexual intercourse took place. Other evidence supports the finding that the sexual intercourse was not consensual and that Parker was the assailant. The living room carpet and couch cushions were spotted with blood, and a clump of Oscars' hair was found on one of the couch cushions. The police found Oscars' underpants and shorts, which were spotted with blood, in the living room which suggests that the sexual assault started there. Oscars' body, found in the kitchen, was naked, except for a T-shirt which had been pulled up to reveal her

breasts. A quilt had been placed under her buttocks, which propped this portion of her body off the floor. Parker's bloody palm prints were found on each side of Oscars' naked body, in a position that suggests that Parker had mounted Oscars from the top.

The semen recovered from Oscars' vagina and rectum was from a nonsecretor. Parker was a nonsecretor. An expert testified at trial that only twenty percent of the population are nonsecretors. Because Parker is a nonsecretor, he could not be positively identified. He was, however, one of the twenty percent of population who could have been the source of the semen. This evidence alone is not enough to support a finding beyond a reasonable doubt. However, in combination with the other evidence, it supports a finding by the jury that a sexual assault occurred beyond a reasonable doubt.

Whether or not the sexual intercourse occurred post-mortem is irrelevant. NRS 200.033(4) only requires a showing of an attempted sexual assault, not that the penetration must be completed during the victim's lifetime. The fact that the sexual intercourse occurred provides ample evidence that the assault against Oscars was sexual in nature.

We conclude that the fourth aggravating factor found by the jury, that the murder involved torture, depravity of mind or the mutilation of the victim, is also supported by the evidence.

This court has held that there must be a showing of "torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind." Robbins v. State, 106 Nev. 611, 798 P.2d 558 (1990), *cert. denied,* 498 U.S. 1036, 111 S.Ct. 1608 (1991).

There was evidence from which a reasonable jury could conclude beyond a reasonable doubt that Parker mutilated the body of Oscars. In Jury Instruction No. 22, "mutilate" was defined as "to cut off or permanently destroy a limb or essential part of the body, or to cut off or alter radically so as to make imperfect." The evidence presented at trial supports the jury's finding of mutilation, in that Parker "permanently destroy[ed]" an essential part of Oscars' body, her brain. At trial, the medical examiner testified to the extensive damage to Oscars' skull and brain. He identified twenty-five irregular blunt lacerations on Oscars' skull. There were multiple skull fractures and bone fragments, some of which were depressed inwards penetrating the brain by as much

as an inch and a quarter. The severe damage to Oscars' skull completely destroyed the brain.

The autopsy showed that many of the blunt trauma blows to the head would have caused Oscars to lose consciousness. Therefore, even after Oscars lost consciousness, Parker continued to inflict severe blows to Oscars' head with a three-by-five inch jagged-edged rock, crushing the skull. The medical examiner testified that one of the lacerations on Oscars' head was over four inches deep, piercing the brain. The blows were hard enough to splatter blood on the walls, stove, and countertop of the kitchen. Oscars' head had to be shaved in order to inspect it because blood saturated her hair.

Additionally, after Oscars was dead, Parker took a kitchen knife and plunged it into Oscars' chest. The evidence supports the finding by the jury that Parker mutilated the body of Oscars.

The jury instruction defined depravity of mind as "a mind characterized by an inherent deficiency of moral sense and rectitude." Parker's killing of Oscars shows a depravity of mind. The rock used as a bludgeon, the ligatures, the post-mortem plunging of the knife into the chest, and the apparent sexual penetration upon a corpse, reveal that this was a crime of depravity.

It is not necessary to discuss the issue of torture as only mutilation *or* torture is required and the jury's verdict can be supported on the basis of mutilation and depravity of mind alone. Based on the foregoing, we conclude that there was ample evidence to support the jury's finding of the aggravating factor that the murder involved mutilation, depravity of mind and/or torture of Oscars.

This court must also review whether the sentence of death is excessive, taking into consideration both the crime and the defendant. Parker asserts that his sentence is excessive and that the sentence is disproportionate under Harvey v. State, 100 Nev. 340, 682 P.2d 1384 (1984). However, the legislature amended NRS 177.055(2) after *Harvey,* and eliminated the "proportionality review" requirement.

In the instant case, the jury found four aggravating circumstances surrounding Parker's crime and no mitigating factors to weigh against those aggravating factors. Parker sexually assaulted Oscars and, with a three-by-five inch jagged-edged rock, bludgeoned her to death. Considering the nature of the crime and the lack of any mitigating factors, the sentence of death is appropriate and not excessive.

In Jones v. State, 101 Nev. 573, 707 P.2d 1128 (1985), this court held that the death sentence is reserved for cases which

exhibit a high degree of premeditation coupled with aggravating circumstances such as brutality, torture or depravity. The instant case meets the *Jones* standard. As previously discussed, there was evidence of brutality and depravity. Also, there was a high degree of premeditation. Parker continued to assault Oscars as she fled from the living room to the kitchen. Oscars' defensive wounds on her hands indicate that she was fighting for her life. Parker raped and sodomized Oscars. Parker inflicted twenty-five blunt blows to Oscars' head with the rock that he apparently brought with him. Parker placed a leather strap and electrical cord around Oscars' neck. Finally, after Oscars had died, Parker took a kitchen knife and sunk it up to the hilt into her chest. These circumstances can amply support the imposition of the sentence of death. There is no countervailing evidence to suggest that the sentence was imposed under the influence of passion, prejudice or any arbitrary factor.

## CONCLUSION

In reviewing the overall record, we conclude that the trial judge did not err, that the evidence supports the findings of the four aggravating factors, and that the sentence was not excessive, considering both the crime and the individual. Having determined that Parker was fairly tried, convicted and sentenced, we affirm in all respects the judgment of conviction and sentence imposed thereon.

ROSE, C. J., STEFFEN, YOUNG and SPRINGER, JJ., concur.