# THE STATE OF NEVADA, Respondent, *v.* THEODORE WILLIAM GREGORY, Appellant.

No. 3570

December 12, 1949.                    212 P.2d 701.

*Leslie B. Gray,* of Reno, for Appellant.

*Alan Bible,* Attorney General, *Homer Mooney* and *Robert L. McDonald,* Deputy Attorneys General, *Harold O. Taber,* District Attorney of Washoe County, and *Grant L. Bowen,* Deputy District Attorney, of Reno, for Respondent.

## OPINION

By the Court, HATTON, District Judge:

Theodore William Gregory, the defendant below, is the appellant here. He will be referred to herein as the defendant. The defendant was charged with the murder of Margaret Tarr by an Information filed by the district attorney of Washoe County, Nevada, on October 8, 1948, to which he entered his plea of not guilty. Upon the trial he was found guilty of murder in the first degree and the death penalty was imposed by the jury. He brings this appeal from the judgment and from the trial court's order denying his motion for a new trial, or, in the alternative, for a modification of the judgment by reducing the same from murder in the first degree to murder in the second degree or a lesser crime included in the crime of murder.

One of the assignments of error in this case is "that the evidence is insufficient to sustain or justify a verdict that the appellant is guilty of murder in the first degree."

The defendant and the deceased, Margaret Tarr, were married in Elko, Nevada, on December 16, 1946. Thereafter they went to Detroit, Michigan, their former home, remaining there for a period of about three months. They then returned to Nevada, taking up their residence at Las Vegas, where defendant was employed as a barber and later as caretaker of an apartment house. They

were divorced at Las Vegas on May 18, 1948, deceased resuming the name of Margaret Tarr. Defendant testified that, immediately after the divorce, she promised to remarry him, that she broke her promise, that she lived with him after the promise, and that he spent money on her and on her daughter by a prior marriage. He suspected her of intimacy with another man, and he brooded over these conditions. Mrs. Engelberger, with whom they were rooming, testified that the defendant said to her, before the shooting, "I guess I lost her, she double-crossed me, I found out where she was that night, and I know what I'm going to do." Police Officer Geiseking testified that the defendant said "he was tired of her 'chippying' around and he warned her if she wouldn't quit that he was going to do what he did." The defendant, in the early morning of the homicide, lay awake for hours awaiting the return of Mrs. Tarr; when he heard the arrival of the automobile, he armed himself with a pistol and went out to the car. He testified that he took the pistol for protection. The evidence shows that, after the door of the car had been opened and the defendant had drawn the pistol, a long conversation and argument ensued between the defendant, Mrs. Tarr and her companion Birch. The defendant evidently desired to satisfy himself as to the degree of the intimacy between Mrs. Tarr and Birch and also to compel Mrs. Tarr to admit that mutual promises of remarriage existed between them and that they had been living together since the divorce as husband and wife. For a time, she refused to make either of these admissions, and the defendant testified that she called him a liar. He testified that Birch "tried to get her to agree with me and she would not; she did make the statement, she said 'Darrel, I won't do it for Ted, but I will do it for you' and that is when it happened." So, according to the defendant's testimony, he had finally obtained from her an admission of the correctness of his contentions, but with her assertion, in substance, that she was

making the admission because Birch requested it. Birch testified that his relations with Mrs. Tarr extended only to their drinking together and his taking her home on the two occasions. During their argument, as testified to by the defendant, neither Birch nor Mrs. Tarr would admit any further intimacy. This left the defendant with only his surmise as to the extent of their intimacy but with the definite knowledge that Mrs. Tarr no longer cared for him and that her affections were directed towards Birch. He told Birch that he did not blame him and his resentment appeared to be directed mainly towards the woman. He was sufficiently calm to direct Birch to drive the car away from the Engelberger's residence in order not to disturb them. From the time of the drawing of the pistol until the moment of the shooting, an interval of about an hour elapsed, according to the defendant's testimony, and, according to the testimony of Birch, the interval covered about two hours. The jury therefore had before them, in the evidence, a substantial period of time in which the defendant could reflect upon and consider what he was about to do. There is substantial evidence that, prior to the night of the homicide, he had at least entertained the thought of killing her. This the jury no doubt considered in connection with the defendant's anger and his indecision, as testified to by Birch, as to whether or not he would kill Birch also. It is the defendant's contention that his mind was so disturbed by the events which had transpired between himself and Mrs. Tarr, her calling him a liar and her expressed preference for Birch, that he was incapable of forming, and did not form or entertain any design or purpose to kill her—that the killing was not deliberate and premeditated but was the result of passion. Immediately prior to the shooting, Birch ran from the car, and, while running, he heard the three shots.

It is stated in 26 American Jurisprudence,

Homicide, p. 189, sec. 43, that "it seems to be settled that words or conduct calculated to arouse, and arousing, sudden passion, may be sufficient to modify homicide from murder in the first degree to murder in the second degree." In the same article, at page 187, sec. 42, the following is stated:

"A very brief period will suffice, provided the formed intent to kill was consciously conceived in the mind of the slayer before the homicidal act was committed. It is sufficient that with the intention to commit the act the appreciation of the result likely to follow appeared to the defendant at the time the act was committed, or that he understood and contemplated the consequences of his act; a killing may be the result of prompt and speedy execution of a hasty or immediate resolution and yet have been done with express malice. When a design is once formed, the haste with which it is put into execution in no way affects or modifies the degree of guilt incurred. Such design may have existed for only an instant before the commission of the crime. Deliberation and premeditation imply a capacity at the time of the commission of the homicide to think and reflect—sufficient volition to make a choice, and by use of the mental powers, to refrain from doing the homicidal act."

The jury no doubt considered whether or not the defendant consciously conceived an intent to kill, and whether or not he understood and contemplated the consequences of his act, his capacity to reflect, to make a choice, and to refrain from doing the homicidal act.

The evidence before the jury was, to a considerable extent, similar to the evidence in the case of State v. Jukich, 49 Nev. 217, 242 P. 590, 594. In that case, Mr. Justice DUCKER summarized the evidence and concluded as follows:

"The appellant, as the evidence shows, came to the house armed with a deadly weapon concealed upon his person. Without provocation he used it with fatal effect

upon an innocent young girl. He attempted to kill the mother and a younger sister. According to the testimony of the latter he struck her and kicked the prostrate form of the girl he had shot and killed. He told the arresting officers that he killed her because she would not marry him and to keep any one else from having her. He told the district attorney shortly after the shooting that she had previously promised to marry him; that her mother had promised her to him, and he had spent all his money on her; and that on the night of the killing when he reproached her for breaking her promise and she told him she did not know why she refused him, he got excited and commenced to shoot. His statements disclose a motive of revenge, and from all of the circumstances the jury was warranted in concluding that the killing was done with malice and deliberation.

"Whether appellant's testimony to the effect that he was so intoxicated as to be unconscious of what he was doing was true or not was for the jury to determine, and was resolved against him by the verdict."

■■ The law of Nevada, as established by the decisions of this court, is that the verdict of a jury will not be disturbed when it is supported by substantial evidence. We conclude that, in the present case, the verdict of the jury was so supported.

■ The defendant assigns as error the ruling of the trial court admitting in evidence a certified copy of the decree of divorce granted to the deceased in Las Vegas. The decree stated the ground for the divorce, namely, extreme cruelty. In the case of Binns v. State, 57 Ind. 46, 26 Am.Rep. 48, cited by defendant, the court states that the proof of a divorce may have been competent to show the state of feelings between the parties. We take the view that as part of the evidence to show the state of feeling between the parties, it was competent and relevant to prove the comparatively recent granting of

a divorce. However, the inclusion in the proof of the statement in the decree as to extreme cruelty was incompetent, and it should have been excluded. The seventeen-year old daughter of the deceased testified that her mother and the defendant, prior to the divorce, quarreled about herself and her brother and about the defendant's gambling, and that on one occasion, at night after retiring, she had heard them arguing, that it sounded as though he "slapped her or something" and that she was crying. On cross-examination she stated that, while they were married and living together in Las Vegas, she had never seen the defendant strike her mother. We consider it highly improbable that the recital of extreme cruelty in the decree added anything to such impression of cruelty as the jury may have received from the testimony of the daughter together with the fact that close relations had been resumed between defendant and the deceased after the divorce. Upon the entire record, we do not regard the error in the admission of the decree in evidence as resulting in a miscarriage of justice or as prejudicial to the defendant in respect to a substantial right. N.C.L., sec. 11266.

The defendant assigns error upon the giving by the trial court of its instruction No. 14. After defining murder and distinguishing its degrees and dealing with the bearing of provocation in determining the degree, the court gave its instructions numbered 12, 13 and 14, setting forth, respectively, the provisions of sections 122, 123 and 124 of the act concerning crimes and punishments, being N.C.L., sections 10069, 10070 and 10071, all bearing upon the subject of manslaughter. Defendant contends that the court erred in giving instruction No. 14 "without including therein words which would make clear to the jury that the provocation referred to therein was the provocation required to reduce the alleged killing to voluntary manslaughter." Defendant contends that "as this instruction reads it gives the

impression to the jury that to reduce the crime at all—to consider heat of passion at all—the passion must be irresistible," and that there should have been interpolated into the wording of the instruction words restricting the same to voluntary manslaughter. The logical sequence of the three instructions, with the reference in each instruction to the subject of irresistible passion, convinces us that the jury were not confused or misled by the alleged defect in the instruction referred to.

The defendant further assigns as error the refusal of the trial court to grant a new trial or to modify the judgment under the terms of subdivision 6 of section 384 of the act concerning crimes and punishments, being N.C.L.1931–1941 Supp., section 11032. The subdivision reads that the trial court has power to grant a new trial,

"6. When the verdict is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."

The foregoing provision, enacted in 1931, evidently was copied from the California statute as amended in 1927, being California Penal Code, section 1181. That statute was considered for the first time by the supreme court of California in the case of People v. Kelley, 208 Cal. 387, 281 P. 609. It was later applied by the court in the case of People v. Daniel, 65 Cal.App.2d 622, 151 P.2d 275, where preceding cases were reviewed. Both in California and Nevada the state constitution provides that the jurisdiction of the supreme court in criminal cases is limited to questions of law alone. The statute referred to came before this court in the case of State v. Robison, 54 Nev. 56, 6 P.2d 433, 436. In that case, the court, speaking through Mr. Justice DUCKER, said:

"The evidence is, we think, sufficient to support the verdict of murder of the second degree. Consequently we could not reverse the judgment on the ground of insufficiency of the evidence, nor are we authorized by statutes of 1931 to modify the judgment to one of manslaughter. The statute does not purport to clothe the court with power to modify a judgment in a criminal case without giving or ordering a new trial, as a matter of leniency, but only when the judgment is not supported by the evidence which does show the defendant guilty of a lesser degree of the crime for which he was convicted, or of a lesser crime included therein. There was, however, as we have indicated, evidence upon which the jury could legally base a verdict of murder."

We conclude that, in the present case, the trial court did not err in refusing to grant a new trial for insufficiency of the evidence to sustain a verdict of murder of the first degree, nor did it err in refusing to modify the judgment.

■ The defendant applies to this court for a modification of the judgment by reducing the crime from first degree murder to second degree murder. We can not say, using the language of the statute, that "the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted" and that it shows him to be guilty only of a lesser degree thereof. On the contrary, we find that the record shows there was evidence of premeditation and deliberation upon which the jury could legally base a verdict of murder of the first degree.

No error appearing, the judgment and order denying defendant's motion for a new trial are hereby affirmed, the petition for modification of the judgment by reducing the degree of the crime is hereby denied, and the district court is directed to make the proper order for the carrying into effect, by the warden of the state prison, of the judgment rendered.

HORSEY, C. J., and BADT, J., concur.

EATHER, J., being absent on account of illness, the Governor commissioned Honorable WM. D. HATTON, Judge of the Fifth Judicial District, to sit in his place.

ON PETITION FOR REHEARING

February 21, 1950.

*Per Curiam:*

**Rehearing denied.**