EDWARD AUGUST MOSER, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 8172

December 30, 1975            544 P.2d 424

[Rehearing denied January 28, 1976]

*Carl Martillaro* and *Arthur J. Bayer, Jr.,* Carson City, for Appellant.

*Robert List,* Attorney General, Carson City; *George E. Holt,* District Attorney, *Dan M. Seaton,* Chief Deputy District Attorney, and *Elliott A. Sattler,* Deputy District Attorney, Clark County, for Respondent.

---

## OPINION

By the Court, MOWBRAY, J.:

A jury found appellant, Edward August Moser, guilty of murder of the first degree and fixed his sentence at life imprisonment with possibility of parole.[1] Moser has appealed from

---

[1]NRS 200.030, subsection 1, as formerly enacted, Stats. Nev. 1967, ch. 523, § 438, at 1470:

"1.   All murder which shall be perpetrated by means of . . . lying in wait . . . or by any other kind of willful, deliberate and premeditated killing . . . shall be deemed murder of the first degree . . ."

his judgment of conviction, asserting several assignments of error, which we reject as meritless; therefore, we affirm.

1. During the early evening hours of December 22, 1972, Moser met his girl friend, Bobbie, at the Basin Bar in Las Vegas. Later in the evening, Roy Batiste entered the bar. Moser and Batiste became involved in a heated argument. There were racial slurs exchanged. Moser claimed Batiste made advances toward Bobbie. Later, Moser left the bar for a short time, and then returned. The verbal battle appeared to have subsided and Batiste, apologizing to the patrons for his actions, departed. At this juncture, the evidence is at a variance. Moser testified that he met Batiste in the parking lot; that Moser became fearful of him and took his shotgun from his car to scare Batiste; that Batiste hit the gun, and it accidentally discharged, killing him. A disinterested witness, William Jarrett, testified differently. He said that Moser, when he noticed Batiste leaving, walked hurriedly past Batiste, exiting the bar before him; that after the two had left, Jarrett pulled the door open and saw the barrel of a gun protruding from a corner of a building, pointed at Batiste, who had one hand raised and the other at his side. Moser was completely concealed. Jarrett witnessed a shotgun blast, saw Moser then emerge from around the building, break open his gun, and remove the remaining shells. Moser left the scene and threw his gun in the desert.[2]

---

[2]"Q. [by Deputy District Attorney Koot] Then, if you would, by using the diagram, please describe to the jury what occurred after that; what did you see?

"A. [by Witness Jarrett] On the shooting?

"Q. Yes.

"A. Well, I opened up the door this way and I stopped halfway out, and here is the porch right here and right here was Mr. Batiste, and I seen a gun barrel right there.

"Q. That is all you saw was a gun barrel?

"A. Yes.

"Q. It was point from which direction?

"A. Pointing this way, that way.

"Q. Assuming that a person was holding that gun, where would he have been standing, approximately?

"A. He would have to be standing somewhere behind that building.

" . . .

"Q. And could you please just describe what happened after that?

"A. Well, I would say within a second the gun went off and then Mr. Batiste staggered back, oh, maybe three or four steps, and then fell down, and then I ran out from here to him and I looked at Mr. Batiste and I looked back toward the door because at first I thought that it wasn't a real shot because the gun was so muffled, and I looked back and I seen Ed there by the doorway and he broke the shotgun open and he started pulling the shells out, I remember distinctly, because of the

2.  Moser claims there was insufficient evidence presented to the jury to support the jury's finding that he was guilty of first degree murder. He claims it was all an accident. There was a direct eyewitness to the crime, and if the jury chose to believe him (Jarrett) rather than Moser, which they apparently did, it was their prerogative to do so.

". . . [O]ne may be guilty of murder in the first degree although the intent to commit such a homicide is formed 'at the very moment the fatal shot is fired.' " Payne v. State, 81 Nev. 503, 509, 406 P.2d 922, 926 (1965). When a design is once formed, the haste with which it is put into execution in no way affects or modifies the degree of guilt. State v. Gregory, 66 Nev. 423, 212 P.2d 701 (1949). Malice aforethought may be inferred from the intentional use of a deadly weapon in a deadly and dangerous manner. Moreover, the intention to kill may be ascertained or deduced from the facts and circumstances of the killing, such as the use of a weapon calculated to produce death, the manner of the use, and the attendant circumstances characterizing the act. Payne v. State, *supra.* There was sufficient evidence in the record below to support a charge of deliberate and premeditated killing.

"Where there is substantial evidence to support a verdict in a criminal case, as the record indicates exists in this case, the reviewing court will not disturb the verdict nor set aside the judgment. Sanders v. State, 90 Nev. 433, 434, 529 P.2d 206, 207 (1974); Azbill v. State, 88 Nev. 240, 495 P.2d 1064 (1972); Crowe v. State, 84 Nev. 358, 441 P.2d 90 (1968).

3.  Moser also contends that the court committed reversible error in giving a "lying in wait" instruction.[3] Appellant contends that the evidence presented did not support such an instruction. The elements constituting "lying in wait" have not heretofore been discussed in Nevada. In addressing this issue, we are guided by that canon of statutory construction which provides that words in a statute having a well defined meaning

---

smoke coming out, and I looked back at Mr. Batiste and red blood was forming. I went back to the bar and yelled at someone to give me some clean bar towels and told Ruby to call the police and call an ambulance."

[3]The instruction read as follows:

"The unlawful killing of a human being, with malice aforethought, with express or implied intent, which is committed by a person lying in wait for his victim, is Murder in the First Degree."

at common law are presumed to be used in their common law sense, unless it clearly appears that another meaning ·was intended. Sheriff v. Smith, 91 Nev. 729, 542 P.2d 440 (1975). A succinct statement of the conduct on the part of the defendant which will support a finding of murder lying in wait is found in People v. Atchley, 346 P.2d 764, 772 (Cal. 1959):

". . . The elements necessary to constitute lying in wait are watching, waiting, and concealment from the person killed with the intention of inflicting bodily injury upon such person or of killing such person. . . ." See also People v. Thomas, 261 P.2d 1 (Cal. 1953). Cf. State v. Brooks, 445 P.2d 831 (Ariz. 1968).

Applying the tests of Atchley, *supra,* to the instant case, we find that there was a "watching, waiting, and concealment." Jarrett's testimony would support an inference that Moser, after concealing himself behind the building, "watched and waited" for Batiste. An instruction will be deemed proper if it is consistent with any reasonable inference that the jury might draw from the evidence. People v. Smith, 298 P.2d 540 (Cal. App. 1956).

4. Moser's final allegation of error results from the prosecution's statements made during final argument, which are footnoted below.[4] The comments made were improper. They were designed to inflame the emotions of the jury. They had no place in a trial, and counsel's objections should have been

---

[4]The record reflects the following:

"MR. McGIMSEY [Deputy District Attorney]: December 22, 1972, Merry Christmas, from Ed Moser to the Batiste family—

"MR. BONAVENTURE [Deputy Public Defender]: I am going to object to that, it has no place in the trial.

"THE COURT: Proceed.

"MR. McGIMSEY: Wouldn't it be nice, as Mr. Bonaventure says, if we could have Mr. Batiste back here? If emotion and a guilty conscience could only bring Roy Batiste back here, wouldn't it be nice? If sorrow could bring Roy Batiste back to his wife and six kids, wouldn't it be nice?

"You saw this Defendant testify up here yesterday. He was emotional, he broke up in places, but let's look at it realistically. Do you think for one minute that this man is sorry for Roy Batiste? Do you think for one minute that man feels sorry for Roy Batiste and those six kids, or do you think this man feels sorry for himself because he committed a murder in cold blood?"

sustained. The issue before us is whether the comments mandate reversal. We have held that the failure of defense counsel to seek corrective instructions precludes appellate review. In State v. Hunter, 48 Nev. 358, 367, 232 P. 778, 781 (1925), this court held that "to entitle a defendant to have improper remarks of counsel considered on appeal, objections must be made to them at the time, and the court must be required to rule upon the objection, to admonish counsel, and instruct the jury." This requirement was reiterated in State v. Fitch, 65 Nev. 668, 200 P.2d 991 (1948), and more recently in Mears v. State, 83 Nev. 3, 442 P.2d 230 (1967). No such request was made in the instant case.

Additionally, this is a case where the evidence was free from doubt. As this court said in Pacheco v. State, 82 Nev. 172, 179, 414 P.2d 100, 103 (1966):

"Improper argument is presumed to be injurious. If the case, however, is free from doubt, the appellate court will not reverse. [Cites omitted.] If it is closely contested, the error will be considered prejudicial. . . ."

An eyewitness observed the murder in the instant case. The issue of guilt was not close. Therefore, we conclude that prejudicial error requiring a reversal and a new trial did not occur. Accordingly, we affirm the jury's verdict and Moser's judgment of conviction.

BATJER, ZENOFF, and THOMPSON, JJ., concur.

GUNDERSON, C. J., concurring:

I agree that the prosecutor's "Merry Christmas" argument constituted misconduct. Moreover, in the factual context of this case, I agree that such misconduct may be deemed non-prejudicial. With the approval of my brethren, however, I take this occasion to note that this court will consider penalizing prosecutors personally for similar derelictions hereafter. Such unprofessional tactics, however well intentioned, burden our court system in intolerable ways.

First, inflammatory argument inevitably creates serious appellate issues, occasioning unnecessary expenditure of time by this court, and by counsel, even if we ultimately decide reversal for a new trial is unnecessary—as we have in this case. The waste ensuing from improvident prosecutorial comment often does not end in this court, of course. Frequently, as may well happen in the instant case, the defense raises similar issues again in federal court, sometimes successfully and sometimes

not, but always at additional public expense needlessly occasioned by the overzealous prosecutor.

Second, where a new trial ultimately is ordered, everything done before is at best a total loss. Indeed, with the passage of time, marshaling evidence necessary for successful presentation of the people's case may have become more difficult and costly, or even impossible. In such instances, the prosecutor's misguided efforts at eloquence may free the person he sought to convict.

Third, judicial resort to the harmless error rule, as in this case, erodes confidence in the court system, since calling clear misconduct "harmless" will always be viewed by some as "sweeping it under the rug." (We can, at best, make a debatable judgment call.) Still, an appellate court like ours cannot try to correct prosecutorial misconduct by abandoning the "harmless error" rule where it seems applicable; for to do so would only impose greater burdens on our court system and penalize the taxpayers who support it.

What, then, should be done when prosecutors burden the courts, and endanger their capacity to deliver justice to the public, by improper argument or similar misconduct? To be effective, it seems, sanctions should place the loss as fully as possible on the offending lawyer.

Accordingly, in cases tried after this date, where the trial transcript discloses improper argument, I understand that this court will consider referring the offending attorney to the local administrative committee for determination of an appropriate penalty. Where a retrial is necessitated, I suggest the penalty might properly include payment of court costs to the state, and an appropriate assessment to cover the cost of public or private defense counsel.

More than a century of admonitions has failed to engender in all who serve as prosecutors that instinct for propriety and fairness which their public duty obviously demands. Manifestly, another approach is indicated.