WILLIAM BRYON LEONARD, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 29568

May 28, 1998                      958 P.2d 1220

[Rehearing denied August 12, 1998]

*Erik R. Johnson,* Carson City; *Richard F. Cornell,* Reno, for Appellant.

*Frankie Sue Del Papa,* Attorney General, and *David F. Sarnowski,* Chief Deputy Attorney General, Carson City, for Respondent.

## OPINION

By the Court, SHEARING, J.:

In October 1987, while incarcerated in prison, appellant William Bryon Leonard stabbed to death a fellow inmate. A jury trial was held in August 1989, and Leonard was convicted of first-degree murder and other crimes and sentenced to death. This court affirmed his conviction and sentence. Leonard v. State, 108 Nev. 79, 824 P.2d 287, *cert. denied,* 505 U.S. 1224 (1992). In September 1992, Leonard filed a petition for post-conviction relief, pursuant to former NRS 177.315,[1] alleging numerous

---

[1]NRS 177.315 and related provisions were repealed in 1993. 1991 Nev. Stat., ch. 44, §§ 31 and 33 at 92.

instances of ineffective assistance by his trial and appellate counsel. The district court held an evidentiary hearing and denied the petition in a written order on October 9, 1996. Leonard has appealed. As set forth below, we affirm the district court's order.

### FACTS

Leonard was an inmate at Nevada State Prison on October 22, 1987, when he stabbed to death fellow inmate Joseph Wright. Correctional Officer (CO) Leonard Bascus, the state's only eyewitness to the crime, testified to the following. On the evening of the crime, he was the shower officer in Unit 7; Leonard and Wright were housed in D Wing of Unit 7. Bascus was supposed to let only one inmate out at a time to shower. He let Leonard out to shower last because Leonard had showered first the day before; after Leonard showered, Wright, the tier porter, would be let out to clean up the wing. This was the usual schedule, which the inmates knew.

Bascus became locked in C Wing of Unit 7 for about ten minutes due to an error by Senior CO Thomas Edwards, who was in charge of the control room for Unit 7 that night. When Bascus returned to D Wing, he did not see Leonard in the shower or in the hallway of the tier of cells; he yelled for Leonard to return to his cell. Although Bascus never saw Leonard reenter his cell, he locked Leonard's cell and opened Wright's cell door from a control box. He then saw Leonard running down the hallway toward Wright's cell. Bascus tried to close Wright's door, but Leonard ran into the cell just before the door slid shut.

Bascus then unlocked Wright's door. Pursuant to regulations, he did not enter the tier alone. He heard banging sounds in the cell. After a minute or two, he saw Wright back out of his cell with his fists raised and blood on his right leg and arm. Leonard then ran out of the cell and tackled Wright. Bascus saw nothing in either man's hands. He went to summon help from Edwards in the control room. When Bascus returned, he saw both inmates on their knees, side by side, facing away from him, with their arms locked around each other. During the entire incident, he never saw Wright take any offensive action towards Leonard other than throwing a punch. Then Leonard rose and walked to his cell, saying generally to everyone in the wing, "Well, a little bit longer and I would have killed him." Bascus locked Leonard in his cell. Wright lay on his back in the hallway and soon died.

An autopsy showed that Wright had suffered twenty-one stab wounds from his head to his feet. One wound penetrated his pericardial sac and the right wall of his heart, causing his death within minutes. Leonard had suffered only superficial scratches on the inside of his right arm.

Senior CO Edwards, who manned the control room for Unit 7 that night, testified that he did not see the altercation. He was in charge of cameras and video recording equipment which could have recorded the events in the tier hallway, but no recording was made. Edwards later gave inconsistent reasons for failing to record anything, and prison authorities later disciplined Edwards and Bascus for their negligent conduct the night of Wright's killing.

Various prison and police personnel who investigated the crime that night testified that Leonard and two other inmates who testified for him at the trial, Frank Armijo and Don Hill, acted amused and carefree after the killing, e.g., Armijo and Hill were singing "Another One Bites the Dust."

A prison plumber located a prison-made weapon, or shank, in the sewer line that serviced the cells of Hill and Armijo. The line did not service the cells where Leonard and Wright were located. Investigators also found two prison-made weapons in shoes in Hill's cell.

The state's forensic criminalist determined from analysis of the metal in the weapons that the weapon found in the sewer line and one of the weapons in Hill's cell had very likely come from a single piece of metal. He could not determine whether the metal pieces in the two weapons had come from the missing legs of a metal locker that was kept in D Wing for the inmates' legal work.

CO James Baca testified that a week or two before Wright's death, he saw Armijo throwing the locker around. He ordered the locker removed from the wing. Sometime after Wright's death, Baca noticed that the rear legs of the locker were missing. He suspected that the shank found in the sewer after Wright's death had been manufactured from the legs.

Armijo and Hill testified for the defense. Their cells were adjacent and directly across the hallway from Leonard's and Wright's cells, which were adjacent to each other. The two said that Leonard was outside Hill's cell speaking with Hill when Wright came out of his cell and attacked Leonard with a shank. Hill also said that Wright threw some powder in Leonard's face. Both inmates testified that Wright was known for violent, some-times homosexual, attacks on other inmates and that he had threatened Leonard. They also testified to racial tensions between black and white inmates; Wright was black, and Leonard and Hill were white. Hill said that Wright had attacked him a few days before Wright was killed; he also said that in another incident another black inmate had attacked Leonard. Hill stated that he had bought one of the shanks found in his shoes from Wright, before he and Wright became enemies, and that Wright had made it from the legs of the locker in D Wing.

John Ignacio, Associate Warden of Northern Nevada Correctional Center, testified for the defense. He said that Wright was serving two life sentences for murder and that an inmate had accused Wright of raping him at the county jail and of threatening to kill him for pressing charges. Ignacio had concluded that Wright was a clear and present danger and sent him to maximum security. An inmate, apparently the one Ignacio had referred to, testified that while he and Wright were incarcerated in jail in 1985, Wright had held a razor to his throat, forced him to orally copulate Wright, and had threatened to kill him if he went to authorities.

The jury found Leonard guilty of first-degree murder. At the penalty phase, the state proved that Leonard had two prior murder convictions, one in Florida and one in Nevada. The state also showed that while in prison Leonard had attacked an inmate with a shank and a correctional officer with a spear-like weapon. It also showed that Leonard had attempted to escape from Nevada State Prison on January 6, 1989.

The defense called Leonard's father and mother to testify. The defense presented one inmate who testified that he once had to threaten Wright with a knife to stave off Wright's sexual advances. Another inmate testified that Wright had assaulted him. Evidence was presented that Leonard was quite strong, had some skills in martial arts, and could take care of himself. The district court was concerned that this evidence might not be helpful to the defense, but Leonard stated that he wanted to show the jury that he was capable of defending himself to lend credence to the defense theory that Leonard was unarmed when attacked by Wright, who was larger and armed.

Evidence was presented, some elicited by the state during cross-examination, that some inmates observe a "convict code" by which they do not rely on prison authorities but protect themselves. One inmate defense witness testified that he had carried a razor into court under his dental plate. The district court had the jury removed and admonished Leonard that such evidence was not in his interest, but Leonard maintained that he wished to pursue it. Security officers obtained the razor, and the jury returned and was shown the razor.

The defense also presented extensive evidence of another incident where a correctional officer simultaneously released Leonard and a black inmate by mistake from their cells in Unit 7 but no violence occurred. Leonard also exercised his right to allocution.

The jury sentenced Leonard to death. This court affirmed his conviction and sentence in Leonard v. State, 108 Nev. 79, 824 P.2d 287, *cert. denied*, 505 U.S. 1224 (1992). Leonard filed a

petition for post-conviction relief in September 1992. The district court held a four-day evidentiary hearing in November 1995 and denied the petition in a written order entered on October 9, 1996.

## DISCUSSION

Leonard contends that his trial and appellate counsel were ineffective in numerous ways. James Wessel and Sue Saunders represented him at trial, and Saunders represented him on appeal.

To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). To establish prejudice, the defendant must show that but for counsel's mistakes, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 694. Judicial review of a lawyer's representation is highly deferential, and a defendant must overcome the presumption that a challenged action might be considered sound strategy. *Id.* at 689.

*Allegations of ineffectiveness during the guilt phase*

*Relying on a theory of self-defense instead of other theories*

Leonard asserts that the most fundamental error of his two trial counsel was relying on a theory of self-defense and rejecting the options of voluntary manslaughter and second-degree murder. Moreover, he argues that the offense most applicable to the facts was mutual combat, pursuant to NRS 200.450, which criminalizes fighting "upon previous concert and agreement."[2]

We conclude that Wessel and Saunders were not ineffective in arguing self-defense but performed reasonably well given the task they faced. Despite CO Bascus's testimony that Leonard attacked first and the fact that Leonard emerged basically unharmed, it was not unreasonable to argue self-defense since defense counsel were able to present other testimony that Wright attacked first as well as undisputed evidence that Wright was a convicted murderer with a history of violent behavior. Nor did counsel reject voluntary manslaughter and second-degree murder; the jury was instructed on both lesser offenses. Wessel mentioned these options only in passing in final argument, but we conclude that it

---

[2]At the time of Leonard's prosecution, NRS 200.450(3) provided that if death ensued as a result of such fighting, a person causing the death would be punished by one to ten years in prison and could be fined as much as $10,000. The statute now provides that such a death constitutes first-degree murder. 1995 Nev. Stat., ch. 443, § 65, at 1189-90.

was a reasonable strategic decision not to argue multiple theories to the jury. Moreover, arguing self-defense did not contradict or undercut the other two options: a jury conceivably could have been convinced that Wright acted in a way which did not justify self-defense but was provocative enough to create an irresistible passion, or at least negate premeditation, on Leonard's part.

Leonard maintains that the defense should have argued that he and Wright engaged in mutual combat. But he offers little if any evidence of an agreement between himself and Wright to fight. Moreover, Leonard theorizes that Senior CO Edwards, the officer in the control room, opened the cell doors so that the fight could occur. He cites a number of circumstances which he considers suspicious, for example: Edwards locked CO Bascus in C Wing for a time, Edwards claimed that he was unaware of the altercation between the inmates and therefore failed to record it, Edwards changed his explanation for this failure, Edwards had been disciplined for concealing a 1985 DUI conviction from prison authorities, and Edwards refused to give any information to the investigator working for Leonard's post-conviction counsel. We consider this theory completely unconvincing speculation, as the jury likely would have if presented with it. The theory founders most directly on the fact that Bascus admitted that he (not Edwards) had mistakenly allowed both inmates out of their cells at the same time. At best, Leonard now simply posits an alternative defense strategy; he does not establish that the strategy followed was unreasonable.

*Failing to argue that the state's evidence concerning the alleged weapon was inconsistent with the state's theory*

Leonard claims that trial counsel were incompetent because they failed to realize that key forensic evidence on the origins of the shank found in the sewer line "actually disproved the State's theory and supported the defense testimony." Leonard mischaracterizes the evidence presented.[3]

Leonard declares that the state's forensic criminalist testified "that the shank found in the sewer *could not be matched* to the

---

[3]Of course, we refer to the attorneys representing Leonard in this appeal when we say, here and below, that "Leonard" has distorted the record. These attorneys are Richard F. Cornell and Erik R. Johnson. Although their briefs reflect a good deal of effort on the part of their client, this court is troubled that their assertions too often go beyond fair argument and are misleading as to the facts. Furthermore, Mr. Cornell and Mr. Johnson are unnecessarily harsh and unfair in their rhetoric when they repeatedly attack the efforts of Leonard's trial and appellate counsel as "foolish," "incompetent," etc. We admonish both attorneys to avoid such unprofessional conduct in the future.

angle iron" which Armijo allegedly tore off the locker. Actually, the criminalist testified that he could not say that the shanks "likely" came from the angle iron, but they were "consistent with it." Thus, the forensic evidence did not disprove the state's theory, as Leonard claims. In fact, Hill testified for the defense that the shanks were made from the same locker, only by Wright instead of Armijo. Therefore, failing to trace the shanks to the locker "disproved" the defense's theory as much as the prosecution's.

The prosecutor argued in closing that there was little doubt that the shanks came from the locker with the missing legs based on the testimony of the criminalist and the correctional officer who had discovered the missing legs. Based on Leonard's mischaracterization of the evidence, Leonard says that his counsel were remiss for not objecting to the prosecution's argument. We conclude that the prosecutor's argument was reasonable and any objection would have been overruled.

Leonard's counsel were not ineffective in this matter.

### Mentioning the possibility of a directed verdict

In her opening statement, Leonard's counsel, Saunders, told the jury that the prosecution would present its case first and if it failed to prove its case, Leonard

> doesn't have to do anything. We don't have to do anything, Mr. Wessel and I. We can ask the judge to find a verdict
>  . . . .
> If that is not the case, and there is some situation where we feel that we need to present the other side, we need to present to you why we feel that Mr. Leonard took the actions that he took, then we will do that.

Leonard says that counsel's reference to a directed verdict misstated the law and prejudiced him because once the district court did not acquit him at the end of the state's case in chief, the jury was led to believe that the court considered the evidence sufficient for conviction. We agree that counsel's statement was inaccurate. If the trial court deems the evidence insufficient, it may advise the jury to acquit, but the jury is not bound by such advice. NRS 175.381(1); State v. Wilson, 104 Nev. 405, 408, 760 P.2d 129, 131 (1988). But we conclude that the statement had little if any prejudicial effect. In context, counsel was telling the jury that Leonard had no duty to put on evidence and that the burden of proof lay entirely with the state. We conclude that no reasonable juror would have relied on counsel's passing remark

to conclude that the state had prevailed if the trial proceeded to presentation of evidence by Leonard.

### Objections in the presence of the jury

Leonard contends that his counsel, Wessel, prejudiced him by objecting in the presence of the jury to evidence that Leonard had attempted to escape from prison. Wessel stated:

> I believe what the state is trying to do is to inflame the passions of the jury by leading them to believe that Mr. Leonard is an escape risk and therefore if they don't impose the death penalty he may cause a death out onto the streets.
> . . . .
> [A]gain, we submit that the sole purpose of this is just to frighten the jury to lead them to believe that Mr. Leonard may escape at some time and maybe cause them harm in the future.

Leonard states that it is improper for a prosecutor to argue that allowing a defendant to live constitutes a personal risk to the jurors, but "such a remark was far more prejudicial . . . when it came *from his own attorney,* whom the jury could reasonably conclude would know what his client was actually intending." We conclude that Leonard distorts the plain meaning, the intent, and the effect of his counsel's words and that no reasonable juror would have believed that Wessel was indicating that Leonard intended to escape and cause them harm.[4]

Leonard also complains that here and at other times during the trial, Wessel unsuccessfully argued evidentiary objections in the presence of the jury, drawing the jury's attention to the evidence and emphasizing its unfavorable effect on the defense. Wessel testified at the post-conviction evidentiary hearing that he wanted his objections on the record[5] and wanted the jury to know that evidence, though admitted, still might not be dependable. Further, the district court stated at the hearing that it would not have allowed most objections to be made outside the presence of the jury or sidebar.

We conclude that Leonard has failed to show that his counsel

---

[4]Nor was it error to admit evidence of Leonard's escape attempt. *See* Emmons v. State, 107 Nev. 53, 60-61, 807 P.2d 718, 723 (1991).

[5]It appears that sidebar conferences were not reported. Since Leonard's trial, this court has adopted SCR 250, which requires that all proceedings in capital cases be reported.

acted unreasonably or prejudiced him in objecting to the admission of evidence.

### Impeachment of a defense witness

Leonard contends his counsel were ineffective in not successfully objecting to the prosecution's improper impeachment of defense witness Hill. The prosecutor offered letters written by Hill which showed racist attitudes and referred to conflicts with black inmates. The district court admitted one such letter after Wessel objected only on grounds of relevance. After the court *sua sponte* raised the issue that the letters constituted improper impeachment by extrinsic evidence of specific acts, it excluded other letters. *See* NRS 50.085(3).

Leonard complains that Wessel first objected on the wrong grounds and then failed, after the favorable ruling, to ask that the first letter be struck. Worse yet, Leonard contends, Wessel allowed "extensive discussions" in front of the jury on the admissibility of the evidence. In discussing the admissibility of the letters, the prosecutor argued that "the defendant's intent is at issue in this case, and this witness has testified regarding the defendant's outlook on black people, one of whom was the victim in this case, and I believe the evidence, as you have seen, goes to that issue." At this point, the district court excused the jury. A lengthy discussion then ensued, and the court excluded the evidence.

Although defense counsel was unable to keep somewhat damaging evidence and argument from the jury, Leonard was not unduly prejudiced. The jury already had evidence of Hill's attitude toward blacks because he had testified that he called them "niggers" and "coons" but maintained that he meant no disrespect, and defense witness Armijo had already testified to the racial tensions in the prison generally.

The prosecutor also elicited from Hill that he had used several aliases. Leonard says that his counsel should have objected. Assuming that evidence of the aliases was improper, we conclude that it had little prejudicial effect given that the jury knew that Hill was a convicted felon serving time in maximum security for armed robbery, possession of a weapon in prison, and attempted escape and had been in prison in California for grand theft.

Leonard also says that his counsel were ineffective in not countering impeachment of Hill by introducing a prior consistent

statement by Hill that Wright was the aggressor. NRS 51.035(2)(b) allows a prior consistent statement "to rebut an express or implied charge against [a witness] of recent fabrication or improper influence or motive." Leonard has not shown where the state expressly or impliedly charged Hill with recent fabrication or improper motive. Absent such a charge, prior consistent statements are not admissible under the statute. Therefore, trial counsel were not ineffective in not offering Hill's prior statement.

### *Defense counsel's discussion of defense witnesses*

In closing argument, responding to remarks by the prosecution, Wessel conceded that defense witnesses Armijo and Hill provided accounts of the fight which differed in some respects. He went on:

> If these two individuals were going to concoct a story, I submit to you that the story would have been perfect in every respect, and not such an *obvious error* in their stories.
>
> I have no explanation as to why their stories are not consistent, other than the fact that this was two years ago. These men did not put down in written reports as to what they saw. And that they did their best to try to recall what happened.
>
> Now, you all had an opportunity to view Donald Hill. There's no question about the fact that Donald Hill is an *obnoxious fellow.* And we're not asking you to like our witnesses. . . . We are stuck with the witnesses that were there on the night in question.

(Emphasis added.)

Quoting only the emphasized words, Leonard contends that Wessel discredited his own witnesses; however, in context the remarks are reasonable and not prejudicial to Leonard.

Leonard also contends that Wessel attacked the credibility of Armijo on redirect examination; however, the record shows that Wessel was attempting in a reasonable and competent way to rehabilitate Armijo after the prosecution's cross-examination.

### *Failing to present more evidence that the victim was the aggressor*

Leonard contends that his trial counsel ineffectively failed to present more evidence regarding Wright's aggressive nature, including: Wright's possession of a prison-made weapon in 1985; his complaints of migraine headaches; an inmate who reported that Wright had been shot in a robbery attempt and did not care if

he died and who also knew Wright as a homosexual who desired young white males; an autopsy finding of semen in Wright's penis; and two other inmates who reported that Wright had thrown boiling water and chemicals at other inmates.

Leonard simply asserts that "a theory could have been developed" that the migraine headaches caused Wright to behave violently. This assertion fails to demonstrate that counsel were unreasonable in failing to pursue such a theory. Regarding the potential testimony by the three inmates, counsel could have reasonably decided it was largely cumulative to other defense evidence and that further reliance on inmate testimony would not have been productive. Leonard claims that the semen in Wright's penis after his death meant that he intended a violent sexual assault upon Leonard; however, Wessel made this very argument in closing argument. We conclude that counsel were not ineffective in dealing with this possible evidence.

At the post-conviction hearing, Wessel could offer no good reason for not presenting at trial the evidence of Wright's prior possession of a weapon. We conclude that defense counsel performed deficiently in not presenting this evidence, but this failure did not significantly prejudice Leonard because other evidence before the jury indicated that possession of prison-made weapons was almost endemic among inmates in maximum security.

*Failing to challenge the state's failure to produce a videotape of the altercation*

Based on the state's failure to produce a videotape of his fight with Wright, Leonard says his counsel were ineffective in failing to move for dismissal or for a jury instruction that the missing evidence would be presumed favorable to the defense. He claims that Senior CO Edwards' inconsistent explanations as to why the tape was not made indicate bad faith on the part of the state.

A conviction may be reversed when the state loses evidence if the defendant is prejudiced by the loss or the state acted in bad faith in losing it. Sparks v. State, 104 Nev. 316, 319, 759 P.2d 180, 182 (1988). To establish prejudice, the defendant must show that it could be reasonably anticipated that the evidence would have been exculpatory and material to the defense. Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 108 (1979). Also, if the state fails out of gross negligence to gather material evidence, a defendant is entitled to a presumption that the evidence would

have been unfavorable to the state, and in cases of bad faith, dismissal of the charges may be an available remedy. Daniels v. State, 114 Nev. 261, 956 P.2d 111 (1998).

Leonard concludes that Edwards' failure to record the fight constituted a loss of evidence by the state. We reject this conclusion. First, although Leonard implies that Edwards may have erased the tape, there is no evidence that a video recording of the altercation was ever made. Therefore, the evidence which Leonard alludes to never existed and was never lost. Second, even assuming that failing to make a recording could be construed as loss of or a failure to gather evidence, we conclude that the rules announced in *Sparks* and *Daniels* do not apply to Edwards' negligence because, even though a state employee, Edwards was not acting for the police or prosecuting authorities when he failed to make a tape. Similarly, any bad faith by Edwards is not attributable to the state in its police or prosecutorial role; moreover, although Edwards' inconsistent statements may constitute questionable attempts after the fact to excuse his negligence in failing to make a tape, they do not indicate a deliberate, bad faith decision not to record the altercation.

Finally, even if the lack of a video recording could be construed as loss of or improper failure to gather evidence by the state, Leonard has failed to show that such a recording could be reasonably anticipated to have been exculpatory. CO Bascus testified that Leonard attacked Wright without provocation, and Wright's numerous stab wounds and Leonard's unscathed condition indicate that Leonard was the aggressor.

Leonard has shown no ineffectiveness of counsel in this regard.

*Failing to object to the instruction on lying in wait*

Jury instruction no. 21 stated:

> All murder which is committed by lying in wait is as a matter of law, murder in the first degree, whether the killing was intentional *or accidental.*
>
> "Lying in wait" consists of watching, waiting and concealment from the person killed *with the intention of inflicting bodily injury* upon such person or of killing such person.

(Emphasis added.) Leonard objects to the two emphasized phrases.

The second paragraph is a sound statement of the law since it

comes directly from Moser v. State, 91 Nev. 809, 813, 544 P.2d 424, 426 (1975). Therefore, it was not ineffective for counsel not to object to it.

The first paragraph seems to have no direct source in Nevada law. However, the state cites People v. Laws, 15 Cal. Rptr. 2d 668, 673-74 (Ct. App. 1993), which holds that under the relevant California statute, any "murder"—not "killing"—committed by lying in wait is first-degree murder. This is so even if the murder resulted from an accidental killing. *Id.* at 674. For example, it is normally second-degree murder if someone shoots a gun toward a person, intending only to scare the person, but hits and kills the person by mistake; however, such a murder perpetrated by lying in wait is of the first degree. *Id.* The first paragraph of the instruction, if carefully read, is consistent with *Laws.*

However, this court need not decide whether the reasoning in *Laws* applies to the relevant Nevada statute (NRS 200.030(1)(a)) or whether the first paragraph of the instruction might mislead a reasonable juror. Even assuming that the instruction was erroneous or misleading, Leonard was not prejudiced. There is no basis to conclude that the jury found the killing accidental since Leonard stabbed Wright twenty-one times. This is confirmed by the fact that the jurors returned a verdict form which indicated that they found Leonard guilty of first-degree murder both by deliberation and premeditation and by lying in wait. Therefore, the jury found the necessary intent for first-degree murder.

*Allegations of ineffectiveness during the penalty phase*

*Failing to present expert testimony*

Leonard says that his counsel were ineffective during the penalty phase in failing to call an expert on prison conditions and the possibility of rehabilitation. He criticizes their relying on convict witnesses, who presented evidence of a violent "convict code" which only prejudiced him.

Although some evidence of a convict code was admitted during the penalty phase, it was not, as Leonard implies, the sole or even main theme of the defense. Leonard does not consider that his counsel called his mother and father to testify for him, presented further inmate testimony on Wright's bad character, and established that on one occasion Leonard and a black inmate had been mistakenly released from their cells simultaneously without incident.

Leonard has failed to demonstrate that presenting some kind of

penal expert would have changed the result of the penalty phase or that his counsel performed unreasonably in presenting mitigating evidence.

### Asking a witness if he was carrying a weapon in court

Inmate Theodore Burkett testified for Leonard at the penalty phase that inmates possessed shanks for protection. Defense counsel Wessel asked Burkett if he had been strip searched before being brought to court to ensure that he had no weapons. Burkett said yes. Wessel then asked if he was carrying a weapon, and Burkett said, "A razor."

Leonard concedes that he wanted Burkett to testify and that Wessel asked this question pursuant to a written note which Leonard handed to Wessel during the examination of Burkett. Nevertheless, he blames his counsel for asking the question and prejudicing his defense.

At the post-conviction hearing, Wessel testified that he was asking Burkett "a series of questions, and then Mr. Leonard would supplement my questions with questions he wanted asked and answered." This was a procedure which he and Leonard had followed during the penalty phase questioning of inmates. Wessel stated, "Things were happening very quickly, and my recollection is that when he asked me to ask that question," the answer would obviously be negative.

It is clear now that Wessel should not have asked the question, but we conclude that Wessel was not acting unreasonably at the time. He was simply relying on Leonard to give him appropriate questions. Up to that point, such reliance was not unreasonable. It appears that Leonard had Burkett smuggle the razor into court to prove some kind of point, apparently the laxness of prison security and the inmates' need to protect themselves. When questioned by the district court outside the presence of the jury, Leonard indicated that he wanted the jury to see the razor. We conclude that Leonard will not now be heard to accuse his counsel of ineffectiveness when it is clear that Leonard himself was responsible for any prejudice which resulted.

### Failing to present evidence of child abuse suffered by appellant and of his positive childhood character

During the post-conviction proceedings, Leonard presented an affidavit from his brother, Barry Leonard, stating that their stepfather had regularly beaten them both as children. Leonard says

his counsel were ineffective for not discovering and presenting this evidence and for not calling as witnesses people whom Saunders interviewed in Florida before the trial, including a teacher, school counselors, and an ex-girlfriend. These people had known Leonard and had positive things to say of him.

Other than the childhood beatings, Leonard has not alleged with any specificity what available evidence was not presented. Evidence of childhood beatings is important mitigating evidence, but Saunders provided adequate reason for not presenting any of the evidence in question. Saunders testified at the post-conviction hearing that the people she interviewed "had positive things to say" about Leonard, but nothing "outstanding." Leonard's ex-girlfriend was reluctant to testify and was not surprised that Leonard was accused of murder in Nevada because she knew of his Florida murder. The teacher and counselors had known Leonard only a short time during his grade school years and had superficial contact with him. Saunders considered that with Leonard's school records and the testimony of his mother and father, testimony by the teacher and counselors would only be cumulative. Saunders interviewed Barry Leonard, but he told her nothing about any childhood abuse. Barry had also just been released from the Florida State Penitentiary.

We conclude that counsel made a reasoned, tactical decision not to call these witnesses.

*Failing to present more evidence of the victim's character and of the prison's role in the crime*

Leonard complains that his counsel did not present Wright's prison record or testimony by more inmates to further attack Wright's character. He considers even more egregious counsel's failure to pursue the "prison's involvement" in Wright's death. He asserts that the jury should have been instructed that this involvement was a possible specific mitigating circumstance.

The jury heard a great deal of evidence concerning Wright's character during both the guilt and penalty phases, and Leonard fails to show how further evidence on this subject would have made a difference. The jury also learned that prison staff, specifically CO Bascus, had negligently allowed Leonard access to Wright. We fail to see how this negligence mitigates Leonard's crime in the least. In referring to the involvement of the prison in Wright's death, Leonard seems to be relying on his theory that Senior CO Edwards intentionally instigated a fight between Wright and Leonard. To reiterate, this is rank speculation void of credibility.

We conclude that no ineffective assistance of counsel occurred in this regard.

### Presentation of mitigating evidence

In her opening statement at the penalty phase, Saunders said that Leonard had been born prematurely, suffered serious head injuries as a child, and had a history of mental and emotional problems and drug abuse. Leonard claims that the defense team presented evidence which either failed to support these claims or disproved them.

This claim is meritless. The defense presented testimony from Leonard's father and/or mother that Leonard was born prematurely, had childhood head injuries, and had mental and emotional problems and abused drugs. The defense also presented expert evidence by audiotape and written report that Leonard had psychiatric problems.

Leonard claims that his counsel mismanaged their calling of witnesses and presentation of other evidence. It appears that the presentation of expert evidence on Leonard's mental and emotional problems probably could have been more effective, but Leonard has not specified how particular evidence differently presented could have changed the result of the penalty phase.

Leonard also complains that counsel failed to object to letters offered by the prosecution as Leonard's, and he claims that Saunders was incompetent in her closing argument. We conclude that these claims have no merit.

We conclude that Leonard has not demonstrated that his counsel were constitutionally ineffective in these matters.

### Failing to object to the instruction on executive clemency

Leonard contends that his counsel were ineffective in failing to object to the jury instruction on the Pardons Board's power to modify sentences, given pursuant to Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), modified by Sonner v. State, 112 Nev. 1328, 1334, 930 P.2d 707, 711-12 (1996). He says that NRS 213.1099(4) would prevent him from ever receiving parole; therefore, the instruction was erroneous under Hamilton v. Vasquez, 17 F.3d 1149 (9th Cir.), cert. denied, 512 U.S. 1220 (1994), and Geary v. State, 112 Nev. 1434, 930 P.2d 719 (1996), reh'g granted on other grounds, 114 Nev. 100, 952 P.2d 431 (1998). Even assuming that those cases would preclude this

instruction in Leonard's case, we conclude that *Hamilton* and *Geary* announced a new rule of law and that Leonard has failed to show that his counsel were ineffective for failing to anticipate that rule.

In *Geary,* this court relied on Simmons v. South Carolina, 512 U.S. 154 (1994). Although *Simmons* was a plurality opinion, a majority of the United States Supreme Court agreed that a state cannot constitutionally preclude a defendant from informing a jury that he has little chance of receiving parole if the jury otherwise faces a false choice between sentencing the defendant to death or sentencing him to a limited period of incarceration, at least where the state argues future dangerousness. *Simmons,* 512 U.S. at 161, 176-77.

The Supreme Court recently concluded that *Simmons* announced a new rule of law and does not apply retroactively in federal habeas proceedings. O'Dell v. Netherland, 521 U.S. 151, 117 S. Ct. 1969 (1997). Leonard's conviction became final when the Supreme Court denied his petition for certiorari in 1992. *Simmons* and *Hamilton* were decided in 1994 and *Geary* in 1996. Therefore, we decline to apply the new rule announced in these cases to this post-conviction proceeding.[6]

### *Failing to object to the form of the special verdict*

The jury found two aggravating circumstances: Leonard committed the murder while under sentence of imprisonment, and he had been previously convicted of murder and other violent felonies. It found two mitigating circumstances: the victim was a participant in Leonard's criminal conduct or consented to the act, and Leonard committed one or more of the aggravating factors while under the influence of drugs or alcohol. The jury returned a special verdict form, whose last paragraph read:

> The mitigating circumstances we have found above:
>
> ___ Are sufficient to outweigh the aggravating circumstances found.
>
> Yes Are not sufficient to outweigh the aggravating circumstances found.
>
> Yes We therefore unanimously set the penalty at death.
>
> ___ We decline to impose the death penalty.

---

[6]In supplemental authorities filed April 29, 1998, Leonard cites Gallego v. McDaniel, 124 F.3d 1065, 1074-76 (9th Cir. 1997). Gallego relies on *Simmons* and thus may be undermined by *O'Dell.* Assuming that *Gallego* is sound authority, we conclude that it does not apply here because the jurors who sentenced Leonard did not receive the executive clemency instructions deemed misleading in *Gallego. See* Sonner v. State, 114 Nev. 321, 955 P.2d 673 (1998).

Leonard objects to the word "therefore" in the third option, which immediately follows the option finding mitigators insufficient to outweigh aggravators. He reasons that once the jury determined that the mitigators did not outweigh the aggravators, the form told the jury that it "therefore" had no choice but to set the penalty at death. This argument might prevail if "We decline to impose the death penalty" were the second option; however, it is the final option, indicating that the jury need not impose death even if mitigating circumstances do not outweigh aggravating circumstances. Moreover, the jurors were instructed that even if they found that mitigators did not exist or did not outweigh aggravators, "you still have the discretion to vote for [a sentence of life imprisonment with or without the chance of parole] rather than the death penalty."

Therefore, the verdict form, read as a whole and with the jury instructions, was not misleading.

*Allegations of ineffectiveness during the direct appeal*

*Failing to challenge the district court's ruling that appellant could be impeached with his prior convictions*

During trial, defense counsel asked the district court to decide whether Leonard's prior felony convictions, including two murders, could be used to impeach him if he testified. Counsel argued that they could not because the defense had stipulated at the beginning of the trial that Leonard was in custody as a convicted felon when Wright was killed. The court ruled that the judgments of convictions could be used to impeach Leonard. It further advised that if Leonard testified that he had acted in self-defense, the state might be able to inquire into the circumstances of the prior crimes, depending on the nature of Leonard's testimony.[7] Leonard chose not to testify.

Leonard contends that his appellate counsel ineffectively failed to challenge the district court's decision. He claims that the district court ruled that the convictions could be used not only for impeachment but as substantive evidence against Leonard. The record shows that the court never ruled that the convictions could be used substantively; it only warned that it might allow such use depending on how Leonard testified.

---

[7]Leonard had a prior conviction of murder in Florida for stabbing to death a man who had been beaten defenseless. He also had a prior conviction of murder in Nevada for stabbing to death an elderly man. Leonard told investigators that the second victim had made homosexual advances and Leonard had stabbed him in self-defense. The district court felt these and other prior convictions "might be admissible to show state of mind as it reflects upon negating the defense of self-defense."

The district court's decision to allow use of the felony convictions for impeachment was within its reasonable discretion. *See* NRS 50.095. Whether inquiry into the nature of the convictions would have been erroneous is not an issue before this court because no such inquiry occurred.

*Failing to challenge the district court's comment on the right not to testify*

During voir dire of venire members, one prospective juror voiced a concern about the emphasis placed on protecting the rights of "criminals" as opposed to the rights of police. The district court said, *"Unfortunately, our system says, you know, for example, the Constitution says no person can be compelled to give evidence against himself. It doesn't say anything about a police officer. So we understand, do you have that same attitude?"* (Emphasis added.)

Leonard asserts that the district court improperly commented on his failure to testify and that his appellate counsel ineffectively overlooked this error. He cites numerous cases for the proposition that direct comment on a defendant's failure to testify is reversible error.

To begin with, the district court's remark did not comment on Leonard's failure to testify because the remark was not aimed at Leonard and was made long before Leonard declined to testify. The court erred in stating that the constitutional protection against self-incrimination was "unfortunate." However, the remark was brief and in passing, and the context shows that the court was not disparaging that protection. The court went on to ask the venire member if his attitude would affect his decision in the case, and he said that he "would certainly attempt to keep it from affecting it." We conclude, therefore, that it was clear to those present in the courtroom that the court was not espousing a critical view of defendants' constitutional rights but instead expected all jurors to respect those rights. Therefore, appellate counsel was not ineffective in failing to raise this issue.

In connection with this issue, Leonard raises for the first time in his reply brief a number of instances of alleged judicial bias during the trial. Pursuant to NRAP 28(c), which requires reply briefs to be limited to new matters in the answering brief, we will not consider these allegations, particularly since our reading of the record has revealed nothing to indicate that the district court was anything but evenhanded in its handling of the trial.

## CONCLUSION

We conclude that none of Leonard's claims of ineffective

assistance of counsel warrants relief. We therefore affirm the district court's order.

ROSE, and MAUPIN, JJ., concur.

SPRINGER, C. J., concurring:

I conclude that the majority is incorrect in ruling that the verdict form relative to mitigating circumstances "was not misleading."

As I see it, not only is the "therefore" misleading—an indication that the death penalty verdict necessarily follows from the previous clause—I also think that putting emphasis on the phrase "*not* sufficient" is prejudicial to the accused.

Given the overall complexion of this case, I am willing to concur in its results and affirm the judgment of the trial court; however, I hate to see this court's stamp of approval being placed on the lop-sided special verdict form that was submitted to the jury in this case.

YOUNG, J., concurring:

I concur with the reasoning and the result of the majority opinion, but write separately regarding the conduct of Leonard's attorneys, Erik R. Johnson and Richard F. Cornell. As the majority notes, these attorneys harshly attack the competence of the counsel who preceded them and, worse yet, distort and disregard facts in their briefs to this court. These two tactics intertwine and form the basis for many if not most of the issues they raise on appeal.

In one example of unnecessary ridicule of Leonard's trial counsel, Johnson and Cornell assert: "Foolishly, [trial counsel] intentionally rejected avoiding a death sentence through conviction of a lesser offense . . . . [and] gambled away Leonard's life . . . ." Such rhetoric is inappropriate even if trial counsel had acted unreasonably; it is unacceptable when, as the majority opinion explains, trial counsel performed reasonably in arguing self-defense. If Johnson and Cornell had spun for the jury their own tale of "mutual combat" and collusion by a senior correctional officer, there is no doubt that a different attorney would now be before us questioning, with much sounder basis, their failed efforts.

Of greater concern, Johnson and Cornell repeatedly misrepresent the factual record to this court. The majority points out several instances, e.g., Johnson and Cornell misstate the forensic evidence in regard to the origins of the shank found in the sewer line and then rely on this misstatement to attack the competency of trial counsel. In an instance not cited by the majority, Johnson and Cornell claim that "undisputed evidence" supported the argument that the victim lay in wait for Leonard and that no

witness "testified to facts which, if believed, would disprove" this argument. This claim is simply false. Correctional Officer Bascus testified that he saw Leonard run down the hallway and into the victim's cell before Bascus could close the cell door. When Bascus unlocked the door, he saw first the victim back out of his cell with blood on his leg and arm and then Leonard run out of the cell and tackle the victim. This testimony utterly contradicts the theory that the victim lay in wait and attacked Leonard.

In another instance, Johnson and Cornell accuse trial counsel of "discredit[ing] Leonard's case" by agreeing "with the prosecutor's position that there were 'obvious errors' in [testimony by two defense witnesses] for which he had no explanation." The record shows, however, that trial counsel actually stated:

> If these two individuals were going to concoct a story, I submit to you that the story would have been perfect in every respect, and not such an obvious error in their stories.
>
> I have no explanation as to why their stories are not consistent, other than the fact that this was two years ago. These men did not put down in written reports as to what they saw. And that they did their best to try to recall what happened.

The majority is correct that these and other assertions made by Johnson and Cornell "go beyond fair argument and are misleading as to the facts." However, admonishing both attorneys is inadequate. Their tactics of distortion and unfair disparagement are not inadvertent or isolated, but repeated and deliberate, and should not be tolerated by this court. Their attempts to mislead this court and their unjustified attacks on Leonard's prior counsel warrant sanctions, which I would impose in the amount of $500.00 each, to be paid to the Supreme Court Library.